**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 11, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

MARK JORDAN,

Defendant - Appellant.

No. 08-1431

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D. Ct. No. 1:04-CR-00229-LTB-1)**

---

Paula Marie Ray, Paula M. Ray, P.C., Denver, Colorado, appearing for Appellant.

John M. Hutchins, Assistant United States Attorney (David M. Gaouette, United States Attorney, David Conner and Gregory Holloway, Assistant United States Attorneys, with him on the brief), Office of the United States Attorney for the District of Colorado, Denver, Colorado, appearing for Appellee.

---

Before **TACHA**, **LUCERO**, and **HARTZ**, Circuit Judges.

---

**TACHA**, Circuit Judge.

Mark Jordan appeals the district court's denial of his motion for DNA testing brought pursuant to the Innocence Protection Act of 2005 ("IPA"), 18 U.S.C. § 3600, as well as its denial of his motion to require the government to

preserve his trial evidence.  We have jurisdiction under 28 U.S.C. § 1291,

AFFIRM the denial of the motion for DNA testing, and DISMISS the appeal of

the motion to preserve as moot.

## I. BACKGROUND

The following facts are taken from this Court's opinion affirming Mr.

Jordan's convictions, which he does not dispute.

> Mr. Jordan was accused of murdering a fellow prisoner at the United
> States Penitentiary in Florence, Colorado.  The crime occurred on the
> afternoon of June 3, 1999 in the maximum-security prison's
> recreational yard.
>
> The victim, inmate David Stone, sat at a picnic table in the prison
> yard wearing only shorts and tennis shoes.  Numerous other prisoners
> were exercising, congregating, and playing games in the outdoor sun.
> Near Stone were three other inmates, including Mark Jordan and
> Sean Riker.  Both Jordan and Riker were observed walking away
> from the table.  Minutes later, someone stabbed Stone three times.
> Two of the wounds were superficial, while the third was fatal.  Stone
> was able to run across the yard before collapsing.  Later that night he
> died.
>
> Two inmates saw the stabbing.  Gary Collins was in the recreational
> yard at the time of the stabbing.  He observed Jordan, oddly dressed
> considering the heat in a khaki shirt and pants, in the vicinity of
> Stone.  Collins saw Jordan walk behind Stone and stab him in the
> back.  Collins described Jordan's action as "swinging a bat" in
> Stone's lower back.  After Collins watched Jordan make other
> stabbing motions, Stone "[t]ook off running."  He also witnessed
> Jordan start running after Stone, but Stone was far ahead.
>
> Another inmate, Tyrone Davis, was also in the yard and observed the
> stabbing.  He saw Jordan standing by Stone, then watched as Jordan
> pushed or punched Stone in the back side in an underhanded manner.
> According to Davis, Stone then started running and Jordan gave
> chase.  He then saw Stone on the ground near a crowd of people, but

-2-

lost sight of Jordan.

Overlooking the recreational yard is the lieutenant's patio. There, Norvel Meadors, an assistant warden at the prison was taking a cigarette break. While he was smoking, he saw "two inmates sprinting across the yard out on the sidewalk." From his vantage point, Meadors could not identify the inmates, but he noticed one was wearing only shorts and no shirt and the other was in the standard prison attire of a khaki shirt and pants. Meadors immediately recognized that the two inmates were involved in a chase, with the shirtless inmate ahead of the fully clothed one. Over the radio, he ordered a compound officer to direct the inmates to cease their action.

Meadors then observed the pursuing inmate stop, while the other one continued running and eventually collapsed to the ground. Meadors saw the inmate in the khaki shirt and pants throw "an object" on top of a housing unit and then sit down at a picnic table. Meadors watched as a compound officer approached this inmate at the picnic table, patted him down, and then took him into custody.

The officer who responded to Meadors's radio call was Benjamin Valle. After Meadors's call, he observed two inmates running, with one about fifteen yards behind the other. Valle watched the trailing inmate stop and then start walking back to a housing unit, throw something up on the roof of the housing unit, and walk over to a bench table and sit down. Valle searched the inmate and then escorted him off the yard. That inmate was Mark Jordan.

Another corrections officer, Fares Finn, Jr., observed the same incidents in nearly identical detail to Valle. A video surveillance camera also captured some of the events that afternoon, among other things (1) four inmates, including Jordan and Stone, sitting at a concrete bench approximately eleven minutes before the stabbing, (2) Jordan approaching where Stone sat immediately before the stabbing, and (3) the subsequent chase between Stone and Jordan. Because of the camera angle, it did not capture the fatal encounter.

*United States v. Jordan*, 485 F.3d 1214, 1216–17 (10th Cir. 2007) (internal record

citations omitted). Later, authorities discovered a bloody knife or shank with its

handle wrapped in cloth on the roof of the housing unit and a blood-stained glove in the prison yard. Mr. Stone's DNA was on the shank and cloth, and a small amount of DNA that did not belong to Mr. Jordan was also on those objects. Scientists could not determine the source of this DNA. Nor could they determine the source of the blood on the glove, or even whether that source was human.

Mr. Jordan was charged with second degree murder, in violation of 18 U.S.C. § 111(a); assault with intent to commit murder, in violation of 18 U.S.C. § 113(a)(1); assault with a dangerous weapon, in violation of 18 U.S.C. § 113(a)(1); and assault resulting in serious bodily injury, in violation of 18 U.S.C. § 113(a)(6). At trial, the government presented two eyewitnesses to the killing as well as the three guards who had seen Mr. Jordan chasing Mr. Stone and then throwing the shank onto the roof. The government also introduced evidence that, after the stabbing, Mr. Jordan made inconsistent statements regarding blood that was discovered on his arm and that he was observed making the "V" sign with his hands and telling another inmate "Guy, I get him out of your way." Finally, in an attempt to suggest a motive, the government demonstrated that Mr. Jordan had accumulated several debts owed to other inmates, which the government contended he wanted to escape by being placed in a segregated cell or being transferred to another prison. Indeed, Mr. Jordan's case manager testified that Mr. Jordan had told him he wanted "to get off this mountain" and that he would have to "hurt someone" to get into another institution. A letter to his

mother also discussed his desire to be placed in segregation.

In his defense, Mr. Jordan did not dispute that he handled the shank that fatally wounded Mr. Stone, that he was the man prison employees saw running across the yard, or that he threw the murder weapon on the roof of the housing unit. Instead, Mr. Jordan denied killing Mr. Stone and claimed Mr. Riker, who was also at the scene of the stabbing, was the actual assailant. According to Mr. Jordan, Mr. Riker stabbed Mr. Stone and then forced the knife on Mr. Jordan, who, in the confusion, started running in panic and then threw the knife on the roof. In support of his defense theory, Mr. Jordan pointed to evidence admitted during the government's case that Mr. Riker was sitting at the same picnic table with Mr. Stone immediately prior to the stabbing, that Mr. Riker had given Mr. Jordan the shank to "hit" Mr. Stone, and that the unidentifiable DNA found on the shank suggested that someone else possessed it. The jury found Mr. Jordan guilty on all four counts, and we affirmed his convictions and sentences on direct appeal.

Then, in August 2008, Mr. Jordan filed a motion for DNA testing and a subsequent motion to preserve evidence under the IPA. In the DNA motion, Mr. Jordan claims that he is actually innocent of the crimes and that additional DNA testing of the shank, cloth, and glove will establish his innocence. The district court denied the DNA motion based on its determination that Mr. Jordan failed to show that (1) the DNA testing method he requests is substantially more probative

than the prior DNA testing method, *see* 18 U.S.C. § 3600(a)(3), and (2) the proposed DNA testing may produce new material evidence that would raise a reasonable probability that he did not commit the offenses, *see id.* § 3600(a)(8). The district court then denied Mr. Jordan's motion to preserve evidence as moot.

## II.  DISCUSSION

A.      Motion for DNA Testing

The IPA requires the court that entered the defendant's judgment of conviction to order post-conviction DNA testing of specified evidence if ten prerequisites are met.  18 U.S.C. § 3600(a)(1)–(10).  Most relevant to this appeal, § 3600(a)(8) provides that the applicant seeking DNA testing under the IPA must show that "[t]he proposed DNA testing of the specific evidence may produce new material evidence that would . . . raise a reasonable probability that the applicant did not commit the offense."

Mr. Jordan suggests that DNA testing of the shank, the cloth, and the bloody glove may reveal Mr. Riker's DNA on those objects, and that this evidence would raise a reasonable probability that Mr. Jordan did not stab Mr. Stone.  We disagree.  Such evidence would only show that Mr. Riker handled those items at some point, which is not at all inconsistent with the government's theory of the case such that it calls into question the strength of the evidence against Mr. Jordan.  *Cf. United States v. Fasano*, 577 F.3d 572, 578 (5th Cir. 2009) (ordering DNA testing under the IPA when favorable results would cause a

"strong case" against the defendant to "evaporate[]").

Indeed, we fail to see how the presence of Mr. Riker's DNA on the murder weapon or other items would undermine the strength of the government's case in any meaningful way. Two eyewitnesses testified that Mr. Jordan stabbed Mr. Stone; no eyewitness testified that someone else committed the crime. Three prison employees also testified, and Mr. Jordan does not dispute, that after the stabbing Mr. Jordan chased Mr. Stone and later threw the murder weapon onto a housing unit. Furthermore, Mr. Jordan made suspicious statements after the incident and there was evidence of a plausible motive. The strength and reliability of this evidence would not be diminished by the presence of Mr. Riker's DNA on the murder weapon or the other items because such evidence would demonstrate, at most, that Mr. Riker touched or handled those items at some point. It would not, however, suggest that Mr. Jordan could not have similarly handled them or that he could not have used them to commit the murder. Indeed, Mr. Jordan appears to concede that he handled the shank by claiming that Mr. Riker forced the weapon on him. Furthermore, the presence of Mr. Riker's DNA on these items would not "explain away" the evidence of Mr. Jordan's motive, his curious statements after the crime, the uncontested fact that he chased the victim and then discarded the murder weapon, or the eyewitness testimony that Mr. Jordan stabbed Mr. Stone. Moreover, the government never relied on DNA evidence as part of its case, and the jury was explicitly informed that a third

person's DNA—and <u>not</u> Mr. Jordan's—was discovered on the shank and cloth.[1] Under these circumstances, we fail to recognize how the identification of that third person would exculpate Mr. Jordan.

Finally, we note that the district judge considering a motion under § 3600 is most often the judge who presided over the defendant's trial, *see* 18 U.S.C. § 3600(a), and is therefore in a unique position to assess the evidence against the defendant and to evaluate whether new DNA testing may produce evidence which would raise a reasonable probability that he did not commit the offense. For all these reasons, we agree that Mr. Jordan has failed to meet that prerequisite under the IPA and thus affirm the denial of his motion for DNA testing.[2]

B.      Motion to Preserve Trial Evidence

Mr. Jordan also appeals from the denial of his motion to preserve evidence. Shortly after filing his motion for DNA testing, Mr. Jordan filed a "Motion to Preserve the Trial Exhibits and Other Evidence." After the district court denied the DNA motion, it also denied the motion to preserve evidence as moot. After that order, however, Mr. Jordan initiated habeas proceedings under 28 U.S.C.

---

[1]We note that the district court erred in stating that Mr. Jordan's DNA was found on the shank. The court, however, did not rely on this in determining that Mr. Jordan had failed to satisfy § 3600(a)(8), and Mr. Jordan does not argue to the contrary.

[2]Because the district court correctly denied the motion under § 3600(a)(8), we need not reach the question whether the new DNA testing method proposed by Mr. Jordan is substantially more probative than the prior testing method. *See* 18 U.S.C. § 3600(a)(3)(B).

-8-

§ 2255. In his view, the § 2255 claims "are dependent upon examination, re-examination, and forensic analyses" of trial evidence in the government's possession. Accordingly, he filed a "Motion for Order Directing Government to Reliably Preserve All Evidence In Its Possession" in his habeas proceeding. This time, the court granted the motion. In light of this current order from the district court requiring the government to preserve Mr. Jordan's trial evidence, we find his appeal of the prior denial moot.

### III. CONCLUSION

The order denying DNA testing is AFFIRMED. We DISMISS as moot Mr. Jordan's appeal of the motion to preserve evidence.

08-1431, United States v. Jordan

**LUCERO**, J., concurring.

I agree with the majority's analysis and result. I write separately only to comment on what I consider the proper standard of review for denial of a motion for DNA testing brought pursuant to the Innocence Protection Act ("IPA"), 18 U.S.C. § 3600. The Fifth Circuit is the only circuit to have considered this issue. It views a prisoner's entitlement to DNA testing under the IPA to be a question of law subject to de novo review. United States v. Fasano, 577 F.3d 572, 575 (5th Cir. 2009). Any underlying factual findings made by the district court, however, are reviewed for clear error. Id.

In drafting the IPA, Congress intended to provide prisoners with a clear-cut mechanism for acquiring post-conviction DNA testing. Pursuant to the IPA: "Upon a written motion by an individual . . . the court that entered the judgment of conviction shall order DNA testing of specific evidence if the court finds that all of the following apply." § 3600(a) (emphasis added). Because the word "shall" is used, a district court is denied discretion to decide whether or not DNA testing is ordered; if all the statutory requirements are met, testing is allowed.

Routinely, a district court will engage in fact-finding before determining whether the IPA requires testing. When a court does so, we afford deference to those factual findings and review for clear error. See United States v. Torres, 569 F.3d 1277, 1281 (10th Cir. 2009). However, the district court's ultimate determination of whether a prisoner is entitled to DNA testing is not within its

discretionary power.  Thus, it is a legal determination that we review de novo.

See Elder v. Holloway, 510 U.S. 510, 516 (1994).

In this case, the district court ruled that Jordan failed to meet the requirements of  § 3600(a)(8)(B).  As a result, we must determine whether this ruling constitutes a finding of fact to which we should defer.  Like the Fifth Circuit in Fasano, 577 F.3d at 575, I conclude that a § 3600(a)(8)(B) ruling is not a factual finding,

Section 3600(a)(8)(B) requires a district court to make a reasonable probability determination akin to that conducted under Brady v. Maryland, 373 U.S. 83 (1963).   A defendant's due process rights are violated under Brady if evidence suppressed by the government is both "favorable to the accused" and "material" to guilt or punishment.  Id. at 87.  "Evidence is material [under Brady] only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Pennsylvania v. Ritchie, 480 U.S. 39, 57 (1987) (quotation omitted).

Similarly, an applicant is entitled to DNA testing under the IPA only if she can show that new evidence "raise[s] a reasonable probability that the applicant did not commit the offense."  § 3600(a)(8)(B).  In essence, the IPA requires a trial court to conduct a materiality assessment.  Under this circuit's case law, "the question of materiality and the possible effect of the withheld evidence on the verdict[] is a mixed question of fact and law," Bowen v. Maynard, 799 F.2d 593,

610 (10th Cir. 1986), which we review de novo, <u>United States v. Williams</u>, 576 F.3d 1149, 1163 (10th Cir. 2009).  By analogy, a district court's conclusion as to whether a prisoner has satisfied § 3600(a)(8)(B)'s standard does not constitute a pure factual determination.  Instead, it is a mixed question of law and fact subject to de novo review.

Accordingly, I would review the district court's ultimate decision to deny Jordan's motion for DNA testing de novo.   For the reasons stated by the majority, Jordan's motion fails under this standard.  I thus concur in the panel's judgment.