10-1564-cr
*United States v. Pitera*

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term, 2011

Docket No. 10-1564-cr

Submitted: September 6, 2011            Decided: April 3, 2012

---

UNITED STATES OF AMERICA,

Appellee,

– v. –

THOMAS PITERA, AKA THOMMY KARATE,

Defendant-Appellant,

---

Before: JACOBS, Chief Judge, MINER* and KATZMANN, Circuit Judges.

Appeal from an Order entered on April 9, 2010, in the United States District Court for the Eastern District of New York (Dearie, J.) denying defendant-appellant's motion to compel post-conviction DNA testing of six items pursuant to 18 U.S.C. § 3600, the court having determined that the proposed testing would not raise a reasonable probability that the defendant did not commit the offense of murder in furtherance of a continuing criminal enterprise.

Affirmed.

> Roger Bennet Adler, Roger Bennet Adler, P.C., New York, New York, for Defendant-Appellant.
>
> Emily Berger and Stephen E. Frank, Assistant United States Attorneys (Loretta E. Lynch, United States Attorney for the Eastern District of New York, of counsel), Brooklyn, New York, for Appellee.

---

* The Honorable Roger J. Miner, originally a member of the panel, died on February 18, 2012. The two remaining members of the panel, who are in agreement, have determined the matter. See 28 U.S.C. § 46(d); 2d Cir. IOP E(b); United States v. Desimone, 140 F.3d 457 (2d Cir. 1998).

1

MINER, Circuit Judge:[1]

Defendant-appellant Thomas Pitera appeals from an Order entered in the United States District Court for the Eastern District of New York (Dearie, J.) denying his motion to compel post-conviction DNA testing of six items pursuant to the Innocence Protection Act (the "Act"). 18 U.S.C. §§ 3600 et seq. (2006). Pitera contends that the testing of these items will provide evidence exonerating him from his conviction for the murder of three persons in furtherance of a continuing criminal enterprise. The District Court determined that Pitera failed to demonstrate that the proposed testing would raise a reasonable inference that he did not commit the offense. On appeal, Pitera faults the government for failing to take reasonable measures to preserve the items he seeks to test and for a lack of due diligence in searching for the items. Pitera contends that DNA on the six items, if found, would raise a reasonable probability that he did not commit the murders for which he was convicted.

**BACKGROUND**

I.      Conviction and Subsequent Proceedings

In an Opinion filed on September 22, 1993, we affirmed

the November 6, 1992, judgment of the District Court for the Eastern District of New York (Reena Raggi, Judge) [following a jury trial,] convicting [Pitera] of various offenses including racketeering, in violation of 18 U.S.C. § 1962(c) (1988); supervising a continuing criminal enterprise ("CCE"), in violation of 21 U.S.C. § 848(a), (c) (1988); murder in furtherance of a CCE, in violation of 21 U.S.C. § 848(e)(1)(A) (1988); and several narcotics and firearms offenses.

United States v. Pitera, 5 F.3d 624, 626 (2d Cir. 1993). We determined that

[t]he evidence . . . abundantly established that Pitera was the ringleader of a criminal group that engaged in murder, drugs trafficking, kidnapping, armed robbery, and various other crimes. Several of the murders were personally committed by Pitera, who dismembered the victims' bodies and buried them in a Staten Island bird sanctuary.

Id. The "criminal group" has been identified as "the Pitera Crew of the Bonanno Organized Crime Family." Pitera v. United States, Nos. 99 CV 191, 90 CR 424, 2007 WL 3005791, at *1 (E.D.N.Y.

---

[1] Judge Miner substantially drafted this opinion for the Court prior to his passing.

Oct. 10, 2007). The jury's verdict included a decision not to recommend the death penalty. Following the verdict, the District Court sentenced Pitera to seven terms of life imprisonment, four terms of imprisonment for twenty years, and five terms of imprisonment for ten years. The court directed that three of the life terms, two of the twenty-year terms, and one ten-year term run consecutively and imposed a fine of $250,000. Pitera, 5 F.3d at 626.

At several times since his conviction and incarceration almost twenty years ago, Pitera has sought post-conviction relief in various proceedings. Many of these endeavors have centered on Pitera's challenges to the testimony of accomplice witness Frank Gangi in relation to the murders for which Pitera was convicted. In rejecting one such challenge, brought in the form of a motion for reconsideration of an earlier dismissal of a motion to vacate conviction made pursuant to 28 U.S.C. § 2255 (and alternatively pursuant to 28 U.S.C. § 2241), then-District Judge Raggi, who presided at the trial, wrote the following:

> Pitera . . . insists that Gangi's arrest files show that he had possession of certain guns and bags similar to those used in some of the charged murders. Pitera submits that this proves that Gangi was the true killer. Certainly, Gangi candidly acknowledged at trial that he was a direct participant in many of the gruesome murders charged in the indictment. What he explained to the jury, however, was that he had committed these crimes with Pitera. This testimony is not undercut by Pitera's "new evidence."

Pitera v. United States, No. CV 99-191(RR), 2000 WL 33200254, at *3 (E.D.N.Y. Dec. 21, 2000) (emphasis in original). Judge Raggi went on to note that "Pitera's involvement in the murders was corroborated in many important respects," citing two specific examples of corroborating evidence. Id.

II.     The Motion for DNA Testing and the Government's Response

Returning once again to his claim that the murders for which he was convicted were in fact committed by Frank Gangi, Pitera on October 30, 2009, filed a motion in the District Court pursuant to 18 U.S.C. § 3600 to compel DNA testing of six items of physical evidence purportedly seized from Gangi, viz. a ski mask, scarf, suitcase, .22-caliber handgun, .357 Magnum, and .22-caliber rifle and scope. According to Pitera, a finding of DNA from one or all of the victims upon the items seized from Gangi would raise a reasonable probability that Gangi was the murderer.

3

In his "AFFIDAVIT IN SUPPORT OF DNA TESTING," Pitera stated the following:

> At trial, I was found guilty of murdering three individuals, known as "Burdi," "Leone" and "Stern." However, I am completely innocent of these charges and I affirm under the penalty of perjury that I did not kill or participate in killing any of these individuals.

The affidavit also includes a statement offering to "provide a DNA sample for comparison purposes."

In a "Supporting Memorandum of Law," filed with his affidavit, Pitera asserted the following:

> In approximately 1998, Mr. Pitera had learned through a FOIA request that the FBI and the prosecuting office had possessed and failed to disclose critical physical evidence relevant to the murder offenses that Gangi had testified too [sic] during Mr. Pitera's trial. The undisclosed "evidence" consisted of a ski mask, scarf, soft-sided zippered suitcase, 22-caliber handgun, .357 Magnum, and a 22-caliber rifle & scope, all of which was confiscated during the government's investigation of "LCN" and found to be the property of cooperating witness Frank Gangi.

In the same Memorandum, he contended that he "me[t] every requirement of the [Innocence Protection] Act." Specifically, Pitera asserted that: the evidence sought to be tested was secured during the investigation of the alleged offenses; he did not waive his right to DNA testing at his 1992 trial; the evidence is in the possession of the government, and its condition has not been compromised; the scope of the proposed DNA testing is reasonable, conforms to scientifically sound methods, and is consistent with accepted forensic practices; his theory of defense is not inconsistent with an affirmative defense presented at trial and would establish his actual innocence; the identify of the true perpetrator was a critical issue during his trial; and DNA testing may produce new material evidence that would support his theory of defense and would raise a reasonable probability that he did not commit the alleged offenses.

Responding to Pitera's motion by letter brief dated February 19, 2010, the government first argued that the evidence seized from Gangi that Pitera seeks to have tested "does not appear to be in the possession of the government." In a section of the letter brief entitled "The Evidence the Defendant Seeks To Test Cannot Be Located and Was Likely Destroyed," the government represented that it "has been unable to locate the six items [Pitera] seeks to have tested, most of

4

which appear never to have been in federal custody." The government referred to Pitera's motion as "appear[ing] to indicate that the items he seeks to have tested were seized from Gangi and two co-defendants by the NYPD [New York City Police Department] during a burglary arrest more than two decades ago." According to the government, the NYPD file for the arrest has been sealed and therefore cannot be reviewed; the NYPD has advised that the .22-caliber rifle to which Pitera's motion referred was destroyed pursuant to its standard policy for evidence disposition; the government has been unable to locate NYPD vouchers for the other items described in the motion; and "any such evidence in NYPD custody was likely destroyed many years ago."

Although the government faulted Pitera for offering no basis for suggesting that five of the six items sought were transferred to federal custody, it did acknowledge Pitera's suggestion that the .357 magnum sought may have been transferred to the custody of the Federal Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"). However, according to the government, "[a] check of ATF records . . . has failed to locate either the weapon or the file associated with it" and "pursuant to ATF policy, any such evidence would likely have been destroyed more than a decade ago." As pertains to the inventory of evidence in its own case against Pitera, the government asserted that two suitcases were returned to Pitera's sister; that "numerous guns associated with the case have been destroyed"; that it "does maintain custody of two handguns and a rifle of the caliber described by the defendant"; however, those firearms were not seized from Gangi and are not those that Pitera seeks to have tested.

Further responding to Pitera's motion for DNA testing, the government contended that the DNA testing sought by Pitera would not raise a reasonable probability that he is innocent. Although Pitera claimed that the testing of the items sought would demonstrate that Gangi committed the murders and "framed" him by testifying against him, the government pointed out that Gangi participated with Pitera in a number of murders. Accordingly, the government argued that Gangi's testimony would not be undercut by the DNA evidence sought, especially in view of "the overwhelming evidence against [Pitera]." Because the DNA evidence could not serve to exculpate

5

Pitera, the government urged denial of the motion. In a reply brief filed in the District Court, Pitera argued that the government failed to authenticate the destruction of the items sought; that the testing would raise a reasonable probability of his innocence; and that the bad faith destruction of the evidence was a violation of due process.

III.    The Decision of the District Court

In denying Pitera's motion, the District Court concluded that "the lack of a forensic connection between [Pitera] and the items he seeks to have tested, if demonstrated, would not raise a reasonable probability that [Pitera] did not commit the offense." United States v. Pitera, No. 90 CR 424 (E.D.N.Y. Apr. 9, 2010), ECF No. 698. This conclusion was based on a determination that, even if DNA testing of the guns and bags revealed only the DNA of the murder victims and Gangi, the testing would not produce any new material evidence that would raise a reasonable probability that Pitera did not commit the murders. The District Court found support in our determination on direct appeal that the evidence "abundantly established" Pitera's guilt, id. (citing Pitera, 5 F.3d at 626), and in the finding of the trial court that Gangi's testimony regarding the murder was corroborated "in many important respects," id. (citing Pitera, 2000 WL 33200254, at *3).

The District Court referred to two examples of corroboration described by the trial court in the opinion denying Pitera's motion to vacate the dismissal of Pitera's habeas petition: jewelry from some of the murder victims located in Pitera's home and Pitera's wiretapped conversation regarding methods for dismemberment and disposal of murder victims. As noted by the District Court, that motion before the trial court was based on alleged newly discovered evidence that Gangi's arrest files revealed. This evidence, namely Gangi's possession of certain bags and guns similar to those used in some of the murders, provides the same foundation for the motion subject of this appeal. In the motion to vacate, Pitera also claimed that the "new evidence" would prove that Gangi was the killer. The District Court found significant the trial court's finding on that motion that this evidence, if disclosed at trial, would not likely have resulted in a different outcome and could not "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Id. (citing Pitera, 2000 WL 33200254 at, *3 (internal quotation marks omitted)).

6

**ANALYSIS**

I.    Of DNA Testing, the Innocence Protection Act, and the Standard of Review

    A.    DNA Testing

    DNA is the abbreviation for deoxyribonucleic acid, which is the genetic material present in the nucleus of cells in all living organisms . . . .  The majority of the DNA is identical from one human to another, but there are locations in the DNA that have been found to differ from one individual to another, with the exception of identical twins.  These are the regions of DNA that are analyzed and used to compare the DNA obtained from an unknown evidence sample to the DNA of a known individual in DNA identification testing. . . .  Questioned or unknown samples collected from the crime scene can be any biological sample including [, inter alia,]: liquid blood or bloodstains, liquid saliva or saliva stains, . . . pieces of tissue/skin; fingernails; plucked and shed hairs . . . ; [and] skin cells on drinking vessels [and] clothing.

Nat'l Comm'n on the Future of DNA Evidence, U.S. Dep't of Justice, Nat'l Inst. of Justice, Post Conviction DNA Testing: Recommendations for Handling Requests 21–22 (1999), available at www.ncjrs.gov/pdffiles1/nij/177626.pdf [hereinafter "DNA Report"].

The Supreme Court has recognized that "DNA testing has an unparalled ability both to exonerate the wrongly convicted and to identify the guilty.  It has the potential to significantly improve both the criminal justice system and police investigative practices."  Dist. Attorney's Office v. Osborne, 557 U.S. 52, 129 S. Ct. 2308, 2312 (2009).  The Court took note of "special approaches" taken by the state and federal governments, "usually but not always by legislation," to ensure the effective use of "this evidentiary tool."  Id.  In Osborne, the Court held that in the absence of a specific statute providing for post-conviction DNA testing, Alaska's general post-conviction remedies were available to access evidence for post-conviction DNA testing and satisfy due process.  Id. at 2317, 2320–21; cf. McKithen v. Brown, 626 F.3d 143, 152–54 & n.6 (2d Cir. 2010) (holding that the New York statute providing for DNA testing satisfies due process and "passes constitutional muster under Osborne").

In its Osborne opinion, the Court took special note of the legislation authorizing the proceeding giving rise to this appeal:

    The Federal Government has . . . passed the Innocence Protection Act of 2004, § 411, 118 Stat. 2278, codified in part at 18 U.S.C. § 3600, which allows federal prisoners to move for court-ordered DNA testing under certain specified conditions.  That Act also grants money

7

to States that enact comparable statutes, § 413, 118 Stat. 2285, note following 42 U.S.C. § 14136, and as a consequence has served as a model for some state legislation.

Osborne, 129 S. Ct. at 2316.

B.      The Innocence Protection Act

To warrant post-conviction DNA testing, as applicable here, the court that entered the judgment of conviction must find the following: (1) that the applicant seeking testing has submitted a written motion setting forth, under penalty of perjury, that he is "actually innocent" of the federal offense for which he is serving a sentence of imprisonment; (2) that "[t]he specific evidence to be tested was secured in relation to the investigation or prosecution of the Federal . . . offense" for which the applicant is serving his sentence; (3) the evidence was not previously subjected to DNA testing, the applicant did not waive his right to request DNA testing of such evidence in a court proceeding after the date of enactment of the Innocence Protection Act, and he did not fail to request testing of that evidence in a prior postconviction motion for DNA testing; (4) that the evidence to be tested is in the government's possession, has been subject to a chain of custody, and has been retained under conditions that ensure the evidence has not been tainted in any manner material to DNA testing; and (5) that the "proposed DNA testing is reasonable in scope, uses scientifically sound methods, and is consistent with accepted forensic practices." 18 U.S.C. § 3600(a)(1)–(a)(5) (2006).

The court must make further findings that (6) the applicant identifies a defense theory "not inconsistent with an affirmative defense presented at trial" and that would establish "actual innocence" of the offense of conviction; (7) in the case of one convicted after trial, as was Pitera, the perpetrator's identify was at issue; (8) the proposed testing "may produce new material evidence" supporting the defense theory identified and "raise a reasonable probability that the applicant did not commit the offense"; and (9) the applicant certifies that he will provide a DNA sample for comparison purposes. Id. § 3600(a)(6)–(a)(9). The Act provides for a "rebuttable presumption of timeliness if the motion is made within [sixty] months of enactment of the Justice For All Act of 2004 or within [thirty-six] months of conviction, whichever comes later." Id. § 3600(a)(10)(A).

8

Rebuttal may include a showing that the application is based on information presented in a motion previously denied or a showing by "clear and convincing evidence" that the sole purpose of filing is to harass or cause delay. Id. § 3600(a)(10)(A)(i) and (ii).

II.    Standard of Review

Although we never have established a standard of review for the denial of a motion for DNA testing, we now establish that standard and apply it in this case: whether a prisoner is entitled to DNA testing under the Act is a question of law subject to de novo review; findings of fact related to that question are subject to review for clear error. See United States v. Fasano, 577 F.3d 572, 575 (5th Cir. 2009); see also United States v. Jordan, 594 F.3d 1265, 1269 (10th Cir. 2010) (Lucero, J., concurring). This comports with our standard of review of determinations made under the provisions of other statutes providing for post-conviction relief. See, e.g., Ponnapula v. Spitzer, 297 F.3d 172, 179 (2d Cir. 2002) (standard of review from denial of habeas corpus).

III.    Of the Reasonable Probability that Pitera did not Commit the Offense

Even if Pitera's application established each of the other prerequisites detailed in the Act, including the requirement that specific evidence be in the possession of the goverment, the application still would fail because he cannot show that the proposed testing "may produce new material evidence that would . . . raise a reasonable probability that [he] did not commit the offense." 18 U.S.C. § 3600(a)(8)(B) (2006).[2] Indeed, for the following reasons, we agree with the District Court that "[t]he present motion merely repackages an argument that has already been rejected by the [D]istrict [C]ourt." United States v. Pitera, No. 90 CR 424 (E.D.N.Y. Apr. 9, 2010), ECF No. 698.

In the present motion, Pitera argues that if the evidence at issue were tested, it likely would contain DNA from the murder victims. Because the evidence was confiscated by the government from Gangi and not from Pitera, Pitera contends that the presence of the victims' DNA on the

---

[2] Because Pitera has failed to show that the proposed testing may produce new evidence that would raise a reasonable probability of his innocence, we need not reach his arguments as to the inadequacy of the government's search for the items sought to be tested, or of its response to Pitera's motion to compel testing.

evidence would establish that Gangi, and not he, was the "'true' perpetrator." As the District Court found, this is the same argument that Pitera raised, and the District Court rejected, in his June 1999 motion to vacate the dismissal of his habeas petition, albeit with a "speculative forensic twist." Id. For the same reasons that the District Court rejected his argument then, we reject it now, namely that "Gangi candidly acknowledged at trial that he was a direct participant in many of the gruesome murders charged in the indictment. What he explained to the jury, however, was that he had committed these crimes with Pitera." Pitera, 2000 WL 33200254, at *3 (emphasis in original).

We agree with the District Court that even if the guns and bags did not show DNA from Pitera, but rather showed DNA only of Gangi and the victims, such a showing would not "raise a reasonable probability that [Pitera] did not commit the offense" because the government's case contemplated (and Gangi so testified) that Gangi committed the murders in conjunction with Pitera. This finding was based not only on Gangi's testimony but also on corroborating evidence, including jewelry from some of the murder victims and Pitera's wiretapped conversation in which he discussed dismemberment techniques.

Our conclusion finds support in the case law. In United States v. Jordan, 594 F.3d 1265 (10th Cir. 2010), the Tenth Circuit was presented with a similar application for DNA testing. In that case, the applicant, Mark Jordan, was convicted of murdering a fellow prisoner while confined in a federal penitentiary. At trial, the government presented the testimony of two inmates who observed the murder. Both inmates testified that Jordan stabbed the victim. Other testimony offered at trial showed that another inmate, Sean Riker, was with Jordan and that both men were observed walking away from the victim minutes before the stabbing. Two corrections officers also testified; however, the officers only observed what occurred after the stabbing — specifically, they observed Jordan flee the scene of the stabbing and subsequently throw something onto the roof of a housing unit. It was later determined that the object thrown on the roof was the murder weapon. The weapon was tested for DNA, and the tests revealed the victim's DNA and "a small amount of DNA that did not belong to Mr. Jordan." Id. at 1267.

10

Following his conviction on, <u>inter alia</u>, second-degree murder charges, Jordan filed a motion seeking additional DNA testing and alleging that the testing would establish his actual innocence. In doing so, he contended that Riker was the actual assailant. The District Court denied the motion, finding that the proposed testing would not raise a reasonable probability that Jordan did not commit the offense, as is required by the Act. In affirming the denial of Jordan's motion, the Tenth Circuit remarked that even if Riker's DNA were found on the weapon, "[s]uch evidence would only show that Mr. Riker handled those items at some point, which is not at all inconsistent with the government's theory of the case such that it calls into question the strength of the evidence against Mr. Jordan." <u>Id.</u> at 1268. The Court also noted the strength of the corroborating evidence as lending support to its conclusion.

As detailed above, the same holds true in this case. That Gangi handled the objects at issue in conjunction with the three murders is not at all inconsistent with the government's theory of the case. Moreover, the District Court noted the strong corroborating evidence, on which we also relied in affirming Pitera's conviction on the underlying offenses. <u>United States v. Pitera</u>, No. 90 CR 424 (E.D.N.Y. Apr. 9, 2010), ECF No. 698 (citing <u>Pitera</u>, 5 F.3d at 626 (noting that the evidence "abundantly established" Pitera's guilt)). Thus we easily conclude that Pietra has failed to show that "[t]he proposed DNA testing of the specific evidence may produce new material evidence that would . . . raise a reasonable probability that [he] did not commit the offense." <u>See</u> 18 U.S.C. § 3600(a)(8)(B) (2006).

## CONCLUSION

For the foregoing reasons, the Order of the District Court is **AFFIRMED**.

11