**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
       *Plaintiff-Appellee*,

v.

BILL TYRONE JAMES DE WATSON,
       *Defendant-Appellant*.

No. 13-30084

D.C. No.
4:06-cr-00045-
SEH-1

OPINION

Appeal from the United States District Court
for the District of Montana
Sam E. Haddon, District Judge, Presiding

Argued and Submitted
May 16, 2014—Seattle, Washington

Filed July 10, 2015

Before: Diarmuid F. O'Scannlain, Andrew J. Kleinfeld,
and Marsha S. Berzon, Circuit Judges.

Opinion by Judge Kleinfeld

# SUMMARY[*]

## Criminal Law

The panel reversed the district court's denial of Bill Watson's 2013 motion pursuant to the Innocence Protection Act to order DNA testing of underwear, clothes, and vaginal swabs in a case in which Watson was convicted in 2006 of knowingly attempting to engage in a sexual act with a person physically unable to communicate unwillingness.

The panel held that Watson satisfied the preconditions that he identify a theory of defense that would establish his actual innocence, and that the identity of the perpetrator was at issue in the trial.

The panel held that new DNA tests that make previously-useless DNA capable of identification amount to "newly discovered DNA evidence" under the Act, even though the underwear and semen are not, thereby rebutting the presumption of the motion's untimeliness.

## COUNSEL

Elizabeth L. Griffing, Axilon Law Group, PLLC, Missoula, Montana; Wendy Holton, Helena, Montana; Brendan McQuillan, Montana Innocence Project, Missoula, Montana, for Defendant-Appellant.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Michael Cotter, United States Attorney, and Laura B. Weiss, Assistant United States Attorney, Great Falls, Montana, for Plaintiff-Appellee.

Colin M. Stephens (briefed), The Innocence Network, Missoula, Montana, and Laura B. Weiss, Assistant United States Attorney, Great Falls, Montana, for Amicus Curiae The Innocence Network.

## OPINION

KLEINFELD, Senior Circuit Judge:

We address whether new DNA tests that make previously useless DNA capable of identification amount to "newly discovered DNA evidence" under the Innocence Protection Act.

### Facts

Bill Watson was indicted for knowingly attempting to engage in a sexual act with a person physically unable to communicate unwillingness, as well as for assault of the victim's brother with a dangerous weapon. The case came to federal court because the indictment charged that Watson, "an Indian person," committed the crimes "within the boundaries of the Rocky Boy's Indian Reservation, being Indian Country." He was convicted of the sex crime but not the assault, and sentenced to 178 months of imprisonment to be followed by five years of supervised release.

The alleged sex crime and assault occurred at a party at J.M.B.'s house. Her mother was away, and the teenaged

children and their friends had obtained two bottles of rum. J.M.B., then 14 years old, got so drunk that a friend and her brother were concerned about her choking on her vomit while she slept, and gagged her to make her throw up. After she vomited, they put her to bed in the master bedroom, her mother's room. Watson went to that bedroom.

From there, the accounts diverged. J.M.B. was unable to give an account of what happened. She testified that she did not remember anything, from when she passed out to when her brother woke her up afterwards. She did not testify to any sexual contact with anyone.

Watson testified that he went to that bedroom because he needed to defecate. He did not want to use the downstairs bathroom because he "didn't want to smell up the bathroom that everybody would go to, and I didn't want to be laughed at." He had to pass through the master bedroom to get to the upstairs bathroom. He testified that he never touched the sleeping girl. When J.M.B.'s older brother asked him what he was doing in the master bedroom, he said he was "coming from the bathroom," and the brother said "bull," and accused him of raping his sister.

The older brother testified that he went to the room periodically to check on his sister, and caught Watson with his pants down, having sex with his unconscious sister. He testified that Watson had "his penis in [his] sister's vagina." Watson had his pants and underpants down, his sister's pants and underpants down, and was "pumping back and forth." Since J.M.B. was unconscious, Watson would have had to have pulled down her pants and underpants. When the brother walked in, Watson withdrew and was visibly "aroused." Watson said he was sorry.

The brother and Watson agree that they got in a brief fight after the brother encountered Watson in the bedroom, and then Watson went downstairs. Watson came back with a hammer and started swinging it at the brother. The brother told the police and the doctor the next morning that Watson had hit him with the hammer, but testified at trial that the hammer never touched him. The doctor who examined him testified that "he had bruises."

Watson left the house after the fight. The brother and a girl who was friends with the brother and with J.M.B. woke J.M.B. up. The girl brought clothes not smelling of vomit, including the mother's underwear from the bathroom floor, to put on J.M.B. J.M.B. testified that she had never worn those underwear before, and her mother testified that the underwear belonged to her.

The medical examination of J.M.B. was inconclusive. In the exhibits submitted with the motion for DNA testing, the emergency room physician stated that J.M.B.'s hymen was not torn. She noted "no evidence of injury or laceration to the vaginal wall," and that "[t]he hymen appears only slightly patulous.[1] It is not torn. It accommodates a narrow speculum easily and the patient tolerates speculum examination really quite well." The medical report stated that there was no injury to the vaginal walls. At trial, the physician testified that she had observed a one millimeter abrasion, four small skin tears, and bluish discoloration that might be bruising or J.M.B.'s normal skin coloration of that skin, in the perineal area.

---

[1] GOULD MEDICAL DICTIONARY 1142 (3d ed. 1972) (defining "patulous" as "expanded, open, loose").

The older brother, who was the only eyewitness to the alleged rape, was drunk himself, having consumed rum from both bottles that night and three or four beers earlier in the day.  And he testified inconsistently with his prior statement to the police that Watson had hit him with a hammer.

An FBI DNA examiner testified that there was no semen on the vaginal swabs.  But she found semen in the underwear J.M.B. was wearing.  The FBI examiner testified that "I was not able to determine the source of the semen in these underwear, because of the extremely small amount of male contribution that was identified by DNA analysis."  She testified that she could not exclude any male from being the source of the semen, because there was not enough of it to test.  All she could determine from the science then available was that the DNA she could identify in the crotch of the underwear came from two women, evidently J.M.B. and her mother.  That DNA was from one or two females, not any male.  The male substance was the semen, but there was not enough of it to test, in 2006, for DNA.

The jury convicted Watson of attempted sexual assault. Seven years later, with the aid of the Innocence Project, which describes itself as "a national litigation and public policy organization dedicated to exonerating wrongfully convicted individuals through DNA testing and reforming the criminal justice system to prevent future injustice,"[2] Watson filed a motion in the district court to order DNA testing of the underwear, clothes, and vaginal swabs.  Watson and the Innocence Project propose to pay for the testing themselves, so the government will not be burdened with the expense.

---

[2] http://www.innocenceproject.org/about-innocence-project.

An affidavit in support of the motion for DNA testing, by Dr. Greg Hampikian, a biology professor at Boise State University, says that DNA testing would now allow identification not only of the contributor of the tiny amount of semen in the underwear, but also of even tiny amounts of DNA from skin cells of anyone who had physical contact with the inside of J.M.B.'s vagina and even, from his hands, contact with her clothing. Scientists call this "touch" DNA testing, that is examining the DNA of someone who merely touched something with his skin, testing not possible when Watson was tried. Watson filed an affidavit saying "I am actually innocent" of the sexual assault, as he testified at trial, and argues that the DNA from the vagina, underwear, and outer clothing will show the absence of any contribution from him.

The district court held a hearing, and denied the motion as untimely. The reason for the ruling was that the statute makes a motion presumptively untimely if made more than three years after conviction. The presumption is overcome by "newly discovered DNA evidence." The underwear, vaginal swabs and outer clothing were all available at the time of trial, so the district court deemed them not to be "newly discovered DNA evidence." Watson appeals.

**Analysis**

We review the question of statutory interpretation *de novo*.[3]

---

[3] *United States v. Youssef*, 547 F.3d 1090, 1093 (9th Cir. 2008) ("Questions of statutory interpretation are reviewed *de novo*.").

In 2004, Congress passed the Innocence Protection Act.[4] It opens the door to revisiting mistaken convictions, when the new science of identifying people by their DNA left at a crime scene may exonerate the wrongly convicted. Forensic evidence can sometimes prove innocence as well as guilt. As the Supreme Court explained in *District Attorney's Office for the Third Judicial District v. Osborne*, "DNA testing has an unparalleled ability both to exonerate the wrongly convicted and to identify the guilty. It has the potential to significantly improve both the criminal justice system and police investigative practices."[5]

The Innocence Protection Act commands testing. It says the court "shall order DNA testing,"[6] not "may" order testing, in the covered circumstances. The statute requires satisfaction of ten criteria, of which three are at issue in this case.

### 1. Actual Innocence and Identity.

The Act preconditions the mandatory testing requirement on, among other things, (1) the applicant's identification of a theory that would establish his actual innocence,[7] and (2) if conviction followed a trial, a showing that the identity of the perpetrator was at issue in the trial.[8] The government argues

---

[4] 18 U.S.C. § 3600.

[5] 557 U.S. 52, 55 (2009).

[6] 18 U.S.C. § 3600(a).

[7] *Id.* § 3600(a)(6)(B).

[8] *Id.* § 3600(a)(7).

that Watson did not identify a theory of defense that would establish his actual innocence, and also that the identity of the perpetrator was not at issue.[9]

---

[9] The ten factors that must be met for a court to order post-conviction DNA testing under 18 U.S.C. § 3600(a) are:

> "(1) The applicant asserts, under penalty of perjury, that the applicant is    actually innocent of–
>
>> (A) the Federal offense for which the applicant is under a sentence of imprisonment or death; or
>>
>> (B) another Federal or State offense, if–
>>
>>> (i) evidence of such offense was admitted during a Federal death sentencing hearing and exoneration of such offense would entitle the applicant to a reduced sentence or new sentencing hearing; and
>>>
>>> (ii) in the case of a State offense–
>>>
>>>> (I) the applicant demonstrates that there is no adequate remedy under State law to permit DNA testing of the specified evidence relating to the State offense; and
>>>>
>>>> (II) to the extent available, the applicant has exhausted all remedies available under State law for requesting DNA testing of specified evidence relating to the State offense.
>
> (2) The specific evidence to be tested was secured in relation to the investigation or prosecution of the Federal or State offense referenced in the applicant's assertion under paragraph (1).

(3) The specific evidence to be tested–

  (A) was not previously subjected to DNA testing and the applicant did not–

    (i) knowingly and voluntarily waive the right to request DNA testing of that evidence in a court proceeding after the date of enactment of the Innocence Protection Act of 2004; or

    (ii) knowingly fail to request DNA testing of that evidence in a prior motion for postconviction DNA testing; or

  (B) was previously subjected to DNA testing and the applicant is requesting DNA testing using a new method or technology that is substantially more probative than the prior DNA testing.

(4) The specific evidence to be tested is in the possession of the Government and has been subject to a chain of custody and retained under conditions sufficient to ensure that such evidence has not been substituted, contaminated, tampered with, replaced, or altered in any respect material to the proposed DNA testing.

(5) The proposed DNA testing is reasonable in scope, uses scientifically sound methods, and is consistent with accepted forensic practices.

(6) The applicant identifies a theory of defense that–

  (A) is not inconsistent with an affirmative defense presented at trial; and

  (B) would establish the actual innocence of the applicant of the Federal or State offense referenced in the applicant's assertion under paragraph (1).

(7) If the applicant was convicted following a trial, the identity of the perpetrator was at issue in the trial.

(8) The proposed DNA testing of the specific evidence may produce new material evidence that would–

　　(A) support the theory of defense referenced in paragraph (6); and

　　(B) raise a reasonable probability that the applicant did not commit the offense.

(9) The applicant certifies that the applicant will provide a DNA sample for purposes of comparison.

(10) The motion is made in a timely fashion, subject to the following conditions:

　　(A) There shall be a rebuttable presumption of timeliness if the motion is made within 60 months of enactment of the Justice For All Act of 2004 or within 36 months of conviction, whichever comes later. Such presumption may be rebutted upon a showing–

　　　　(i) that the applicant's motion for a DNA test is based solely upon information used in a previously denied motion; or

　　　　(ii) of clear and convincing evidence that the applicant's filing is done solely to cause delay or harass.

　　(B) There shall be a rebuttable presumption against timeliness for any motion not satisfying subparagraph (A) above. Such presumption may be rebutted upon the court's finding–

　　　　(i) that the applicant was or is incompetent

Watson's defense was that he did not commit the act charged. He testified that he used the upstairs bathroom, but he never touched J.M.B. on his way to or from the bathroom. That would indeed be "actual innocence," so the question is whether DNA testing with post-trial technology would prove it. Among the arguments presented to the jury was that one of the other party-goers might have raped J.M.B. That argument put the identity of the perpetrator at issue.

The only solid evidence that there was a rape was J.M.B.'s brother's testimony. The medical evidence was

> and such incompetence substantially contributed to the delay in the applicant's motion for a DNA test;
>
> (ii) the evidence to be tested is newly discovered DNA evidence;
>
> (iii) that the applicant's motion is not based solely upon the applicant's own assertion of innocence and, after considering all relevant facts and circumstances surrounding the motion, a denial would result in a manifest injustice; or
>
> (iv) upon good cause shown.
>
> (C) For purposes of this paragraph–
>
>> (i) the term "incompetence" has the meaning as defined in section 4241 of title 18, United States Code;
>>
>> (ii) the term "manifest" means that which is unmistakable, clear, plain, or indisputable and requires that the opposite conclusion be clearly evident."

inconclusive about whether J.M.B. had been raped and, if so, who had done it. The small tears and abrasions in the perineal area suggest that she was, but the intact hymen and absence of any damage to the vagina suggest that she was not, considering the brother's description of how the rape was perpetrated.

The brother's credibility was at issue because he was drunk, and because he told inconsistent stories about whether Watson had hit him with a hammer. The jury acquitted Watson on the charge of assaulting the brother. It is hard to see how they could acquit, unless they doubted the brother's ability or inclination to perceive, remember, and relate the truth.

Since the brother's credibility was weak and the medical evidence inconclusive, the semen in the underwear has to have been important to the jury's decision whether to believe J.M.B. had been raped. There was not enough semen to determine from the DNA testing possible at the time of trial whose it was. But the semen proved that some male had had sexual contact with a female who had worn the underwear. That corroborated to a degree the brother's eyewitness testimony that Watson raped J.M.B., as well as the possible implication from the medical testimony that J.M.B. could have been raped.

Now that post-trial DNA testing has made it possible to test this previously too small sample, it could prove actual innocence and mistaken identity in at least two ways. The DNA test might show that one of the other males at the party, not Watson, had raped J.M.B. Or, in conjunction with the medical evidence suggesting an unruptured hymen, it might suggest that no one had raped J.M.B., and some sexual

relationship of the mother rather than rape of her daughter explained the semen.

That is not to say Watson's guilt would be impossible after the DNA testing, even if none of the DNA found was his. Impossibility is so rare that it cannot be a requirement for "actual innocence." But the probability might be so low that actual innocence would be the only sensible explanation. It would be hard to reconcile DNA proved to be someone's other than Watson's, and no semen or even "touch" DNA from Watson, with Watson's having raped J.M.B. The only sensible explanations consistent with the absence of Watson's DNA would be that someone else, or no one, had raped J.M.B.

Touch DNA could also be persuasive evidence of Watson's innocence. The evidence submitted on the motion supports that identifiable DNA could now be obtained from the vaginal swabs and even from J.M.B.'s shorts, showing who pulled them off. The prosecution's theory was that Watson pulled J.M.B.'s shorts off her to rape her. J.M.B.'s brother testified that when he put J.M.B. to bed she was fully clothed. Touch DNA only became available after Watson's conviction. If touch DNA testing is as good as the evidence before us suggests, it could also prove Watson's innocence, if he is innocent.

Our sister circuits have, like us, looked at the facts of the particular case to evaluate whether post-conviction DNA testing could, in the particular circumstances, establish actual innocence or mistaken identity. The Fifth Circuit in *United States v. Fasano* reversed a denial of testing, where eyewitness testimony established guilt, but a negative DNA test would undermine the credibility of four eyewitness

identifications.[10]    The Tenth Circuit in *United States v. Jordan* upheld a denial of testing, where the DNA testing would not be exculpatory, since the applicant admitted handling the bloody knife.[11]  Likewise, in *United States v. Pitera*, the Second Circuit upheld a denial because the absence of Pitera's DNA on the gun and other items would not establish that he did not commit the murder together with the shooter.[12]  By contrast, in the case before us, if, as her brother testified, Watson had pulled down J.M.B.'s shorts and was having sexual intercourse with her, as corroborated by the semen found in the underpants put on her afterward, the absence of his DNA and the presence of another male's DNA on the shorts and the vaginal swabs, and in the semen, would indeed be inconsistent with his guilt.

Neither innocence nor guilt can be proved with scientific certainty, regardless of whether the proof is scientific, and the significance of evidence necessarily varies from case to case. Where the presence or absence of the movant's DNA would not show actual innocence, there is no reason to test for it. Where it would, the statute compels testing so long as the movant complies with the Act's other requirements.

## 2.  Timeliness.

The government's strongest argument against testing the semen for identifiable DNA is that Watson's request is untimely.  He was convicted in 2006, and made his motion,

---

[10] 577 F.3d 572, 574, 578 (5th Cir. 2009).

[11] 594 F.3d 1265, 1268–69 (10th Cir. 2010).

[12] 675 F.3d 122, 129 (2d Cir. 2012).

after getting legal assistance from the Innocence Project, in 2013. The Act enabling convicts to get post-conviction DNA testing makes motions presumptively untimely five years after its 2004 enactment or three years from conviction.[13]

---

[13] "The motion is made in a timely fashion, subject to the following conditions:

> (A) There shall be a rebuttable presumption of timeliness if the motion is made within 60 months of enactment of the Justice For All Act of 2004 or within 36 months of conviction, whichever comes later. Such presumption may be rebutted upon a showing–
>
>> (i) that the applicant's motion for a DNA test is based solely upon information used in a previously denied motion; or
>>
>> (ii) of clear and convincing evidence that the applicant's filing is done solely to cause delay or harass.
>
> (B) There shall be a rebuttable presumption against timeliness for any motion not satisfying subparagraph (A) above. Such presumption may be rebutted upon the court's finding–
>
>> (i) that the applicant was or is incompetent and such incompetence substantially contributed to the delay in the applicant's motion for a DNA test;
>>
>> (ii) the evidence to be tested is newly discovered DNA evidence;
>>
>> (iii) that the applicant's motion is not based solely upon the applicant's own assertion of innocence and, after considering all relevant facts and

Watson's motion was, as he concedes, presumptively too late.

Watson's timeliness argument depends on the statutory provision that the presumption of untimeliness is rebutted, if "the evidence to be tested is newly discovered DNA evidence."[14]  Although the district judge articulated a finding of untimeliness, that finding is actually a legal conclusion. The district court determined that the untestable DNA was not "newly discovered DNA evidence" because the underwear and other clothing were themselves not newly discovered.  It is uncontested that, as the government's expert witness testified, the semen could not then be tested for DNA evidence.   Watson's motion establishes, without contradiction, that scientific developments since the trial have made it possible now, but not then, to get an identification from the tiny quantity of DNA.  So our question is one of law—does a change in the scientific evidence potentially available concerning certain objects constitute "newly discovered evidence" when the objects to be investigated are not newly discovered?

We conclude that the DNA is "newly discovered DNA evidence" even though the underwear and semen are not.  A specimen of DNA not usable to identify anyone is not evidence that anyone in particular deposited it.  Semen proves a deposit from the male half of the population, but not from

---

circumstances surrounding the motion, a denial would result in a manifest injustice; or

(iv) upon good cause shown."

18 U.S.C. § 3600(a)(10).

[14] *Id.* § 3600(a)(10)(B)(ii).

a particular male. Unlike semen, DNA, if capable of being examined, would be evidence of which male had sexual contact with a wearer of the underwear. The proposition for which identifiable DNA would be evidence is an entirely different proposition from that for which the underwear with semen would be evidence. The issue critical to Watson's guilt or innocence is not the semen, but whose it was. Where only a single male could be the perpetrator, semen might be all the evidence needed, but where, as here, the semen could have come from other males, innocently if by way of J.M.B.'s mother, or criminally from some other male at the party, a DNA test identifying which male it came from is the evidence that makes or breaks the case.

The word "discover" connotes obtaining knowledge of a thing, not just tripping over it.[15] It would be an anomalous use of the word "discover," as in "newly discovered DNA evidence," to apply it to something possessed without the capability of knowing what it is. Doubtless many people possessed radium before Marie Curie discovered its properties, and uranium was used to make yellow glass for centuries before anyone discovered other uses for it. We would not say that a seventeenth century Czech glass blower had discovered radioactive substances, even though they were piled in the corner of his shop. It was only subsequent to 1892 that viruses small enough to pass through filters were discovered to be the causes of many diseases of plants,

---

[15] *See* THE AMERICAN HERITAGE DICTIONARY 403 (2d college ed. 1985) (defining "discover" as "[t]o obtain knowledge of through observation, search, or study"); *see also* 4 THE OXFORD ENGLISH DICTIONARY 752 (2d ed. 1989) (defining "discover" as "[t]o obtain sight or knowledge of (something previously unknown) for the first time; to come to the knowledge of; to find out").

animals and people, though people had possessed the diseased leaves, cattle and so forth since time immemorial.[16] A dead cow would not, before that, have been discoverable evidence of foot-and-mouth disease, even if one had its carcass in a laboratory.[17] Wigmore defined "evidence" as a "knowable" fact "on which the determination of the tribunal is to be asked."[18] Here, the "knowable" fact, knowable now but not at trial, is whose DNA was in the underpants on J.M.B.'s person and clothing. The fact that matters, whose semen it was, did not become knowable, so it could not be evidence, until post-trial scientific advances made its discovery possible.

Congress provided for scientific advances in one of the preconditions for mandatory DNA testing. Either the evidence had not previously been subjected to DNA testing (as here, because it was too small a sample), or it had been, but a new method was "substantially more probative."[19] This phrasing provides for mandatory testing even where the DNA has been tested before. The government argues that because the "new method" phrase is used in requirement 3 of the list of 10 requirements for DNA testing, but not in requirement

---

[16] GARY N. CALKINS, THE SMALLEST LIVING THINGS 14 (1932).

[17] See id. at 15.

[18] See 1 WIGMORE ON EVIDENCE § 1 (Tillers rev. 1983) ("Any knowable fact or group of facts, not a legal or a logical principle, considered with a view to its being offered before a legal tribunal for the purpose of producing a persuasion, positive or negative, on the part of the tribunal, as to the truth of a proposition, not of law or of logic, on which the determination of the tribunal is to be asked.").

[19] 18 U.S.C. § 3600(a)(3)(B).

10, the timeliness and "newly discovered DNA evidence" or "good cause shown" language, we should infer the negative pregnant that new methods will not suffice to rebut untimeliness. We cannot see what purpose Congress might have had for so providing. The statute does not say that. The government proposes to read into requirement 10's silence about new methods an implied negative pregnant. Some statements imply a negative pregnant, some do not. "Sometimes there is no negative pregnant: 'get milk, bread, peanut butter and eggs at the grocery' probably does not mean 'do not get ice cream.'"[20]

Our reading of "newly discovered DNA evidence" does pose a risk of subsequent testing on old DNA from many closed cases. Congress created the statutory remedy, though, expressly for individuals already under sentence of imprisonment or death pursuant to a conviction,[21] thereby sacrificing finality to accuracy of a conviction. Were the statute not an intentional Congressional rejection of finality where innocence could be proved by DNA, Congress would not have provided a remedy that benefits no one but persons already convicted.

Another obvious risk created by the statute is the expense of a flood of post-conviction DNA testing requests. Congress addressed that as well, by requiring that the applicant, the

---

[20] *Longview Fibre Co. v. Rasmussen*, 980 F.2d 1307, 1313 (9th Cir. 1992); *see also* BLACK'S LAW DICTIONARY 1132 (9th ed. 2009) (defining a "negative pregnant" as "[a] denial implying its affirmative opposite by seeming to deny only a qualification of the allegation and not the allegation itself").

[21] 18 U.S.C. § 3600(a).

convicted criminal, pay for the test, except when indigent.[22] There are federal grants to the states for post-conviction DNA testing.[23]  As for the indigent applicants, they run a very great risk in requesting a DNA test if they are guilty, so absence of a financial burden does not mean they are undeterred.  If the applicant turns out to be the source of the DNA tested, the government may apply for a contempt of court penalty, the Bureau of Prisons may deny good time, the Parole Commission may deny parole, and inculpatory DNA findings may be forwarded to appropriate state officials.[24]  Those convicted in state court may have even more to lose from asking for DNA tests when they are guilty than do federal defendants, because state systems typically offer more good time and parole.  Watson's lawyers, the Innocence Project, propose to pay for his DNA test, but even so, he has a lot to lose if his DNA is found in the semen in J.M.B.'s underwear. He risks loss of good time and contempt penalties.

We conclude that Watson successfully rebutted the rebuttable presumption of untimeliness.  The DNA evidence must be deemed "newly discovered," since it was not discoverable before.  Because we accept Watson's "newly discovered DNA evidence" argument under subsection (B)(ii), we do not reach his "upon good cause shown" argument under subsection (B)(iv).  Since we do not reach the "good cause" argument, we do not reach the government's counterargument based upon the delay between the post-trial

---

[22] *Id.* § 3600(c)(3).

[23] 42 U.S.C. § 14136(a).

[24] 18 U.S.C. § 3600(f)(2)(B).

scientific advances and Watson's motion, or Watson's rebuttal arguing that he was appropriately diligent.

## Conclusion

No tradition is more firmly established in our system of law than assuring to the greatest extent that its inevitable errors are made in favor of the guilty rather than against the innocent.[25]   Our legal tradition has always followed Blackstone's principle that "it is better that ten guilty persons escape than that one innocent suffer."[26]  The moral force of our criminal law requires this allocation of the risk of error, both with respect to standard of proof and to scientific testing of newly discovered evidence critical to guilt.  "It is critical that the moral force of the criminal law not be diluted by a standard of proof [or, we suggest, a rejection of scientific testing] that leaves people in doubt whether innocent men are being condemned."[27]   Not all share our revulsion at punishment of the innocent, of course.  But Americans have always been revolted by the notion that it is better that the innocent suffer than that some of the guilty go free.

Consistent with our tradition, Congress has created a device to end the suffering of the innocent, where their innocence is scientifically demonstrable by DNA evidence, even after their convictions have become final.  The most hallowed principle of our criminal law, protecting the

---

[25] *See In re Winship*, 397 U.S. 358, 368–72 (1970)  (Harlan, J., concurring).

[26] WILLIAM BLACKSTONE, 4 COMMENTARIES *358.

[27] *In re Winship*, 397 U.S. at 364.

innocent, requires us to eschew a crabbed, restricted construction of the statute. Watson moved in timely fashion for previously unperformed DNA testing, based on newly discovered evidence—the results of DNA testing not possible at the time of trial—that could well prove his actual innocence and mistaken identity. His motion should have been granted.

**REVERSED AND REMANDED.**