*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2016 UT 12**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

JIMMY DEAN MEINHARD,
*Petitioner*,

*v.*

STATE OF UTAH,
*Respondent*.

No. 20140038
Filed March 23, 2016

On Direct Appeal

Third District, Salt Lake
The Honorable L.A. Dever
No. 130900232

Attorneys:

Troy L. Booher, Beth E. Kennedy, Jensie L. Anderson,
Salt Lake City, for petitioner

Sean Reyes, Att'y Gen., Andrew F. Peterson, Asst. Att'y Gen.,
Salt Lake City, for respondent

ASSOCIATE CHIEF JUSTICE LEE authored the opinion of the Court, in
which CHIEF JUSTICE DURRANT, JUSTICE DURHAM, and JUSTICE
HIMONAS joined.

JUSTICE JOHN A. PEARCE became a member of the Court on
December 17, 2015, after oral argument in this matter, and
accordingly did not participate.

ASSOCIATE CHIEF JUSTICE LEE, opinion of the Court:

¶ 1   In this case and another heard at the same time, *Gordon v.
State*, 2016 UT 11, __ P.3d __, we consider important issues of first
impression under Part 3 of the Postconviction Remedies Act (PCRA).
UTAH CODE § 78B-9-300 to -304. In this case we consider an appeal
from the denial of a postconviction petition for DNA testing under
section 301(2)(f) of that statute. The district court denied the petition

under that provision on the basis of its determination that the petitioner had not established that the evidence in question had the "potential to produce new, noncumulative evidence that will establish the person's factual innocence." *Id*. § 78B-9-301(2)(f).

¶ 2  We affirm in part, reverse in part, and remand. We interpret the operative terms of the statute—in particular, the "new, noncumulative evidence" clause and the requirement of a "potential" for producing such evidence. Because we find the district court's analysis only partially in line with the law as we understand it, we reverse and remand to give the district court an opportunity to resolve the issues identified below in light of our opinion.

I

¶ 3 Jimmy Dean Meinhard was convicted of murder and tampering with evidence in a jury trial held in 1999. Those convictions were affirmed on appeal and upheld on multiple postconviction challenges in state and federal court.

¶ 4  Meinhard now seeks to challenge his conviction through a petition for postconviction DNA testing and, ultimately, a claim of factual innocence. The petition for DNA testing was denied in the district court. Meinhard challenges that decision on this appeal.

A

¶ 5  According to the evidence at the underlying trial,[1] Meinhard and his victim (Ronald Peterson) were part of the same group of friends. Their group included Meinhard's wife, Terry Meinhard; Peterson's girlfriend, Dawn Downs; and Larry Taylor, who was living with the Meinhards.  These individuals' personal relationships extended beyond mere friendships. Terry Meinhard was romantically involved with Peterson—purportedly with Meinhard's knowledge and consent. And before she was Peterson's girlfriend, Downs had been involved romantically with Taylor.

¶ 6  In February 1997, Meinhard asked Taylor to drive him to Downs's mobile home in Tooele, where Peterson had periodically been staying. The point of the drive was to confront Peterson about some missing tools that Meinhard thought Peterson had stolen—a thought that earlier had prompted Meinhard to announce that "he

---

[1] This statement of facts "is presented in a light favorable to the prosecution, and consistent with the judgment of conviction." *Pinder v. State*, 2015 UT 56, ¶ 5 n.1, ___ P.3d ___.

was going to kill" Peterson. Trial Day Three Transcript at 28–29 (Jan. 28, 1999).

¶ 7   Meinhard could not drive his own pickup truck because he had broken his left leg in a motorcycle accident a few months earlier and his truck had a stiff clutch. The accident was a serious one. It dislocated Meinhard's left shoulder, fractured his right arm, and caused a serious leg injury. The injuries to the arm and shoulder were serious but not permanent. By the time of the visit to Downs's trailer, Meinhard had regained almost full use of his right arm, and he had recovered sufficiently from the shoulder injury to terminate physical therapy about three weeks later. But the leg injuries were more permanent. Meinhard required reconstructive surgery with extensive pins and rods. This prevented Meinhard's ankle from bending, required him to walk with a cane, and made his injured leg turn outward when he walked. When Meinhard and Taylor arrived at Downs's trailer, Meinhard got out of the car and instructed Taylor to drive out of sight, but to follow Meinhard and Peterson out of town if he saw the two leaving in Peterson's car. Downs's neighbor observed Meinhard and Peterson arguing outside, heard a car start, and noticed later that Peterson's car was gone. As instructed, Taylor followed Meinhard and Peterson as the two headed south out of Tooele. When Peterson and Meinhard pulled to the side of the road, Taylor passed them and pulled off further up the road.

¶ 8 The evidence at trial indicated that Meinhard stabbed Peterson to death while Taylor waited. Peterson was stabbed first in the stomach, causing him to fall over the steering wheel, and then in the back, face, chest, and hand. He bled to death quickly.

¶ 9   Fearing that something was wrong with Peterson's car, Taylor turned around and began driving back. He then saw Peterson's car approaching and noticed that Meinhard was driving, though he could not see Peterson. Taylor turned around again and followed the car until Meinhard pulled off the road. Taylor then pulled the car he was driving even with Peterson's car, rolled down the window, and heard Meinhard say, "I did him in. . . . I killed him." Trial Day Two Transcript at 155 (Jan. 27, 1999).

¶ 10 Meinhard instructed Taylor to follow him as he disposed of the body. Meinhard stopped the car and Taylor waited further down the road as Meinhard dragged Peterson's body up a dirt trail, covered Peterson in his own jacket, stabbed him twice more in the upper back, and left his body in the brush. Again following Meinhard, Taylor drove to where Meinhard abandoned the car,

approximately three hundred yards from a side road near Highway 73. Meinhard got into Taylor's car covered in blood. He threw the knife he had used out the window, along with some of Peterson's personal belongings, during the drive back to Salt Lake City.

¶ 11 Upon returning home, Meinhard called his wife and asked her to come home from work. When Ms. Meinhard arrived, Meinhard confessed, "I killed Ron," and threatened her and Taylor that if they told anyone about the murder, "he would kill [them], too." Trial Day Three Transcript at 34 (Jan. 28, 1999). Meinhard was excited and happy while threatening his wife and Taylor. Ms. Meinhard related that "[h]is eyes were real [sic] big and shiny.'" Trial Day Three Transcript at 35 (Jan. 28, 1999). Although Meinhard was normally very punctual to work, arriving every day at 4:15 p.m., he did not clock in until 10:00 p.m. on the night of the murder.

¶ 12 Three days after the murder, and during a heavy snowstorm, Meinhard asked Taylor to accompany him back to Peterson's car. The two went to the store at approximately 2:00 a.m., bought bleach and toothache medicine, and proceeded to the abandoned car. They found the car after a long search, and Meinhard told Taylor to wait for him further up the road. Meinhard then proceeded to use bleach in an attempt to destroy fingerprints and other evidence in and on the car.

¶ 13 Police found Peterson's car later the same day, but another day passed before police found the body. Blood evidence confirmed that Peterson had been killed in the driver's seat of his car and dragged across the console into the passenger seat before his body was removed and dumped in the bushes. Police found large footprints in the snow, footprints that clearly showed a "'unique gait,' the left foot being turned outward as much as 45 degrees." Trial Day Two Transcript at 81 (Jan. 27, 1999). Police also found an empty box of toothache drops and the medication itself, although a different brand from the one police later found in Meinhard's possession. Police later analyzed Meinhard's shoes, which matched the tread found in the snow around Peterson's car and were much larger than Taylor's shoe size.

¶ 14 In light of defensive wounds found on Peterson's body, the medical examiner opined that Peterson died after a violent struggle. Police collected fibrous material that appeared to be dark hairs from Peterson's hands and a dried substance that looked like blood under the fingernails. The State sent the fibers found on Peterson's hands and a fingerprint found on the car's door handle for testing, but the print was too incomplete to identify anyone, and the supposed hairs

turned out to be vegetation fibers. Additionally, the State performed DNA testing on the dried substance from Peterson's fingernail clippings, but the results showed no human DNA.

¶ 15 Taylor confessed his role in the crime and testified against Meinhard. Ms. Meinhard also testified against her husband, though she initially wrote a letter to Meinhard stating that she knew him to be innocent, implicating Taylor. Both witnesses told revised stories (different from the version told in their initial questioning by investigators), and both exchanged their testimony for dropped charges. Two other people testified to having heard Meinhard confess. A correctional officer declared that he overheard Meinhard tell other prisoners that he was in the facility because he had killed someone by stabbing him with a knife. A fellow inmate also stated that Meinhard had initially denied the murder but eventually confessed that he intended to blame the murder on his wife and Taylor, detailing to the inmate how he killed Peterson, hid the body, and destroyed the evidence days later. Meinhard claims the inmate was untruthful and had exchanged testimony against other inmates for leniency in four separate instances. Other inmates stated that Meinhard had remained true to his story that he was innocent and had been framed.

¶ 16 After a jury convicted Meinhard of murder and tampering with evidence, he was sentenced to consecutive, indeterminate prison terms of five years to life and one to fifteen years. The Utah Court of Appeals affirmed the conviction in 2001, *see State v. Meinhard*, 2001 UT App 304, 2001 WL 1243357, and this court denied *certiorari*, *see State v. Meinhard*, 42 P.3d 951 (Utah 2002). Meinhard then filed a petition for writ of habeas corpus in federal district court, which was denied. The U.S. Court of Appeals for the Tenth Circuit affirmed that decision. *See Meinhard v. Friel*, 118 Fed. App'x, 392, 393, 2004 WL 2786643 (10th Cir. 2004). Meinhard also filed two other petitions for postconviction relief, both of which were denied and then affirmed on appeal. *See State v. Meinhard*, 2006 UT App 320, *cert. denied*, 150 P.3d 544 (Utah 2006); *Meinhard v. Turley*, 2009 UT App 150, *cert. denied*, 218 P.3d 620 (Utah 2009).

B

¶ 17 This case involves another petition for postconviction relief. In this petition Meinhard requests DNA testing of the material under Peterson's fingernails and the fingerprint on Peterson's car door under Part 3 of the Postconviction Remedies Act. UTAH CODE §§ 78B-9-300 to -304. Although the DNA testing performed in 1998 came up

inconclusive, failing to identify any human cells, Meinhard alleges that advances in technology have made it possible to extract an individual's DNA from mixed DNA samples, from "very small amounts of genetic material," and from touch DNA, "which is left behind when skin cells touch an object." Appellant's Brief at 6, 49.

¶ 18 Meinhard contends that such tests will show his factual innocence. He alleges that the tests will reveal DNA from Taylor, or from his wife or some other third party, but not from Meinhard. And he asserts that such results will implicate someone else and show that he was not in the car during the murder and did not return to the scene afterwards.

¶ 19 The district court denied Meinhard's petition. It agreed with the State that "[n]o possible combination of DNA test results would prove Mr. Meinhard innocent." Memorandum Decision and Order Denying Petition for Postconviction DNA Testing at 33 (hereafter "Memorandum Decision and Order"). In interpreting section 78B-9-301(2)(f), the court held that "the statute is specific in its requirement that it is the DNA evidence—not the DNA evidence plus other new evidence—that must prove the Petitioner's factual innocence." *Id.* at 18. To qualify for DNA testing, the court concluded that Meinhard was required to demonstrate by a preponderance of the evidence that the new DNA evidence alone would potentially provide exculpatory evidence. *Id.* Thus, even if another person's DNA were found under Peterson's fingernails or on the car door, the court reasoned that that would prove only that Peterson did not scratch Meinhard and that Meinhard did not touch Peterson's car. This, in the district court's view, would not prove Meinhard's innocence.

¶ 20 The court also found little evidence that Peterson fought his killer. The trial record suggested that the defensive wounds on Peterson's body "were clearly the result of the killer's knife cutting Peterson's flesh," and the court quoted the medical examiner's statement that the victim was "trying to ward off an attack of a sharp object." *Id.* at 27–28. Thus, in the district court's view, "[t]he circumstances of the murder do not logically require the killer's DNA to be found under Peterson's fingernails or on the door handle." *Id.* at 35.

¶ 21 The district court further reasoned that even if another person's DNA is discovered, the DNA could have gotten under Peterson's fingernails in a variety of different ways, "such as during a sporting event or sexual contact." *Id.* at 38. And on that basis the court concluded that the "DNA would not clearly relate to the murder, and that result would not exonerate [Meinhard]." *Id.*

¶ 22 For these reasons the court denied the petition, concluding that "the absence of [Meinhard]'s DNA—with or without finding someone else's DNA—is entirely consistent with his guilt." *Id.* at 35. "[W]hen viewed in its entirety," the court held that "the evidence weaves together to form a compelling, coherent and internally consistent picture of Petitioner's actions at both the murder and the cleanup." It concluded that "[p]etitioner is the common denominator that links each unique piece of evidence," and thus that he "has not provided any theory explaining how the totality of that evidence is in any way consistent with the guilt of another person, or why he confessed to numerous people if he was not guilty." *Id.* at 31. And the court denied the petition on these grounds.

II

¶ 23  The denial of Meinhard's petition was based on three essential grounds. First, the district court implicitly endorsed the procedural form of the State's request that the court deny the petition for DNA testing—a written submission styled as a "Response in Opposition to Petition for Post-Conviction DNA Testing," which asked the district court to dismiss the petition on the merits by concluding that "the evidence that is the subject of the request for testing" lacks "the potential to produce new, noncumulative evidence that will establish [Meinhard's] factual innocence." Response in Opposition to Petition for Postconviction DNA Testing at 1–3, 41–42; *see* UTAH CODE § 78B-9-301(2)(f). Second, the district court rendered an interpretation of the controlling terms of the operative provision of Part 3 of the PCRA—specifically, the clause requiring a showing that the evidence to be subject to testing have the "potential to produce new, noncumulative evidence" establishing the petitioner's factual innocence. Memorandum Decision and Order at 18. And finally, the court applied that provision to the facts of this case, concluding that Meinhard had failed to carry his burden under this provision and dismissing the petition on its merits on that basis.

¶ 24 Meinhard has raised no objection to the procedural form of the State's response. So we decline to opine on the propriety of the procedure followed below, or its conformance with our decision in *Gordon v. State*, 2016 UT 11, ¶ 14, __ P.3d __. The remaining questions presented were raised and properly preserved. In the district court and on this appeal, Meinhard has objected to the district court's interpretation of the terms of section 301(2)(f) of the PCRA. And he has also challenged the court's application of that provision to the disposition of this case. We review the district court's interpretation

of section 301(2)(f) *de novo. See Irving Place Assocs. v. 628 Park Ave, LLC*, 2015 UT 91, ¶ 11, 362 P.3d 1241 (concluding that "legal questions of statutory interpretation" are considered "de novo, affording no deference to the district court's legal conclusions"). And because we find error in the district court's interpretation of the statute, we yield no deference to its application of the law to the facts of the case.

¶ 25  To sustain a request for postconviction DNA testing, a PCRA petitioner must show that "the evidence that is the subject of the request for testing has the potential to produce new, noncumulative evidence that will establish the person's factual innocence." UTAH CODE § 78B-9-301(2)(f). The district court denied Meinhard's request for DNA testing because it concluded that "no possible DNA test result could prove that Petitioner did not murder Peterson." Memorandum Decision and Order at 17. In so doing, the court concluded as a threshold matter that "it is the DNA evidence — not the DNA evidence plus other new evidence — that must prove the Petitioner's factual innocence." *Id*. at 18.

¶ 26  In addition, the court implicitly interpreted the statutory term "potential" in a series of conclusions assessing the likelihood that the murderer left DNA under Peterson's fingernails or on the car door handle in question. Specifically, the court suggested that Meinhard bore the burden of establishing that "the circumstances of the murder . . . logically *require* the killer's DNA to be found under Peterson's fingernails or on the door handle."[2] Memorandum Decision and Order at 35, 38 (emphasis added). The court also viewed the record as undermining Meinhard's theory that there may have been human hairs in Peterson's hands, as suggesting that Peterson inflicted only "defensive" wounds on the killer, and as showing "no logical connection between the fingerprint and the killer." *Id.* at 35. The court thus concluded that "[t]he circumstances of the crime scene dictate that *no one's* DNA would be found in the

---

[2] Alternatively, the court elsewhere framed the burden a bit differently — suggesting that Meinhard's petition failed because in its view the evidence indicated that Meinhard "would not have left any biological evidence . . . such as skin cells under Peterson's fingernails," or that "[t]he circumstances of the crime scene dictate that no one's DNA would be found in the car or on Peterson's person." Memorandum Decision and Order at 32. But this formulation is equally problematic, for reasons explained below in part II.B.

car or on Peterson's person, thus negating [Meinhard's] theory of innocence premised on the lack of his DNA at the scene." *Id.* at 32.

¶ 27 Ultimately, moreover, the court held that "any test result showing the presence of DNA belonging to someone other than Petitioner could not prove the identity of the killer." *Id.* at 38. It based that decision on the determinations that "[s]uch DNA could have become lodged under Peterson's fingernails at any time before the murder and in any number of ways, such as during a sporting event or sexual contact," and that "such DNA would not clearly relate to the murder, and that result would not exonerate Petitioner." *Id.* at 38.

¶ 28 In so ruling, the district court made two threshold legal conclusions and then applied the law to the facts of this case. The court's legal conclusions went to the meaning of "new, noncumulative evidence" and (implicitly) to the "potential" that it be produced. And the court's ultimate determination was that Meinhard had not carried his burden of satisfying the statutory standard for ordering DNA testing. For reasons explained below, we affirm the district court's construction of "new, noncumulative evidence," but reverse as to its implicit interpretation of the "potential" that it be produced. And because the district court's view of "potential" seemed to pervade its analysis, we reverse and remand to allow it to reassess the question whether Meinhard carried his burden under the statute as clarified in this opinion.

A

¶ 29 The district court's first threshold legal conclusion concerned the meaning of "new, noncumulative evidence." It held that the referenced "evidence" is limited to "DNA evidence," and does not encompass "other new evidence" that DNA evidence might lead to indirectly. Memorandum Decision and Order at 18. Meinhard challenges that conclusion on appeal. He claims that the PCRA allows a petitioner to point to potential evidence beyond the DNA test results themselves to support a postconviction petition for testing. Thus, in Meinhard's view, a postconviction petitioner could establish a right to DNA testing by indicating the possibility that the requested DNA test results could ultimately lead to a confession. In the context of this case, Meinhard claims that he has a right to DNA testing even if test results alone would not exonerate him; it is enough in his view if such test results may "spark an investigation that leads to exonerating evidence." Appellant's Brief 49.

¶ 30 Under this line of thinking, it would not be essential for a DNA testing petitioner to explain how the *DNA test results themselves* would establish the petitioner's factual innocence (as in a rape case, for example, where a semen sample not available at trial is tested and reveals DNA test results that exclude the petitioner and inculpate someone else[3]). Instead, in Meinhard's view, a successful DNA petition could simply indicate how DNA test results would eventually lead to *other evidence* that would exonerate the petitioner. Under Meinhard's reading of the statute, for example, DNA testing could be awarded if it could be established that DNA test results could lead to the identification of a new suspect, and that additional evidence (such as a confession by that suspect) would establish the petitioner's factual innocence.

¶ 31 Meinhard bases this position on the plain meaning of "new, noncumulative *evidence.*" He contends that the term *evidence* sweeps more broadly than DNA test results, encompassing leads on new witnesses and new physical or documentary evidence.[4] And he notes that the statute speaks more specifically elsewhere of "DNA test results," *see* UTAH CODE § 78B-9-303(2)(b) — an indication, in Meinhard's view, that the legislature must have meant to encompass more than just test results in the reference to "new, noncumulative evidence."[5]

---

[3] *See, e.g., United States v. Watson*, 792 F.3d 1174, 1180, 1183 (9th Cir. 2015) (upholding a petition for DNA testing under the Innocence Protection Act (18 U.S.C. § 3600), where previously untestable semen in a rape victim's underwear could now be tested, and the DNA testing "could well prove [the petitioner's] actual innocence" given the facts of the case).

[4] *See* BLACK'S LAW DICTIONARY 673 (10th ed. 2014) (defining *evidence* as "[s]omething (including testimony, documents, and tangible objects) that tends to prove or disprove the existence of an alleged fact; anything presented to the senses and offered to prove the existence or nonexistence of a fact").

[5] Meinhard also rests his position on the modifier "new." He claims that all DNA test results are "new," and thus insists that the statute must have reference to other types of evidence. We disagree. Section 301 expressly limits its provisions for DNA testing to cases in which "the evidence was not previously subjected to DNA testing," or where "new testing may resolve an issue not resolved by . . . prior testing." UTAH CODE § 78B-9-301(2)(d). The statute's reference to "new, noncumulative evidence" is an apparent reinforcement of this

(continued . . .)

¶ 32 Meinhard has a point if we consider the term *evidence* in isolation. But we do not read statutes in isolation. We read them holistically. *See Olsen v. Eagle Mountain City*, 2011 UT 10, ¶ 9, 248

---

provision. We often presume that each term of a statute has independent meaning. *See Hi-Country Prop. Rights Grp. v. Emmer*, 2013 UT 33, ¶ 24, 304 P.3d 851. But that is only a presumption. *Id.* (referring to the "*presumption* of independent meaning (and/or its converse, the *presumption* against surplusage) (emphasis added)); *Roberts v. Sea-Land Servs., Inc.*, 132 S. Ct. 1350, 1360 (2012) (asserting that the presumption "that 'identical words used in different parts of the same act are intended to have the same meaning . . . readily yields whenever there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were employed in different parts of the act with different intent'" (citation omitted)); ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 174, 176 (2012) ("*If possible*, every word and every provision is to be given effect . . . [L]ike all other canons, this one must be applied with judgment and discretion, and with careful regard to context. It cannot always be dispositive because (as with most canons) the underlying proposition is not *invariably* true. Sometimes drafters *do* repeat themselves and *do* include words that add nothing of substance." (emphasis added) (alteration in original)); LINDA D. JELLUM, MASTERING STATUTORY INTERPRETATION 104 (2008) ("Statutes are not *always* carefully drafted. Legal drafters often include redundant language on purpose to cover any unforeseen gaps or simply for no good reason at all." (emphasis added)); *Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 81 (2011) (Scalia, J., dissenting) (citing a British opinion that notes that sometimes statutory language "adds nothing but emphasis," and observing that "[t]he canon against superfluity is not a canon against verbosity"; also noting that "[w]hen a thought could have been expressed more concisely, one does not always have to cast about for some additional meaning to the word or phrase that could have been dispensed with"). And the presumption is rebutted in circumstances where the terms of the statute suggest that the legislature was using a redundancy as a point of emphasis. That seems to be the case here. The adjective "new" appears repeatedly in Part 3 of the PCRA as a modifier for "DNA test results." *See* UTAH CODE § 78B-9-303(2)(a)(i), (2)(c), & (2)(d). This, again, seems to reinforce the express requirement of section 301(2)(d). And we think the same adjective fulfills the same function in section 301(2)(f).

11

P.3d 465. And in the broader context of the surrounding provisions of Part 3 of the PCRA, we interpret "new, noncumulative evidence" as the district court did—as a reference to DNA test results, and not to any and all evidence that might conceivably be uncovered as an indirect result of DNA tests. That conclusion follows from two essential premises.

¶ 33 First, section 301(2)(f) is supposed to be a meaningful hurdle, and it would not be if Meinhard's view prevailed. DNA testing is expensive; postconviction litigation over such testing is even more so. Postconviction review, moreover, is supposed to be the exception, not the rule. If we accepted Meinhard's reading of the statute, the trigger for DNA testing in section 301(2)(f) would be easily met in most any case. All it would take to get DNA testing would be imaginative lawyering. And that would hardly be difficult. Most any lawyer could conjure a chain of events in which DNA testing could generate a new lead that could conceivably give rise to a confession or a new piece of (non-DNA) evidence. That would effectively nullify section 301(2)(f). And that effect calls Meinhard's view into serious question. *See* JOHN F. MANNING & MATTHEW C. STEPHENSON, LEGISLATION AND REGULATION 229 (2d ed. 2013) ("[A]n interpretation that renders certain *terms* duplicative may not be much of a problem, but an interpretation that renders a *substantive provision* of a statute entirely superfluous is something courts should strain to avoid.").[6]

¶ 34 Second, and more importantly, the balance of Part 3 clarifies the meaning of "new, noncumulative evidence." The full statutory phrase is "new, noncumulative evidence *that will establish the person's factual innocence*." UTAH CODE § 78B-9-301(2)(f) (emphasis added). And other provisions of the code make clear that only DNA test results can establish factual innocence under Part 3 of the PCRA. Section 303(2)(b) says that expressly. It provides that the court may vacate the conviction only if it "determines that *the DNA test result* demonstrates by clear and convincing evidence that the person is

---

[6] *See also VCS, Inc., v. Utah Cmty. Bank*, 2012 UT 89, ¶ 18, 293 P.3d 290 (rejecting a statutory interpretation that would "run[] afoul of the settled canon of preserving independent meaning for all statutory *provisions*" by "effectively nullify[ing] the 180-day requirement set forth in the general rule" (emphasis added)); JAMES KENT, COMMENTARIES ON AMERICAN LAW *467 n.(y1) (Charles M. Barnes ed., 13th ed. 1884) (observing that repeals by implication are "very much disfavored").

factually innocent."[7] UTAH CODE § 78B-9-303(2)(b) (emphasis added).[8] Thus, when read in the context of the overall statute, the section 301(2)(f) reference to "new, noncumulative evidence that will establish the person's factual innocence" must be a reference to DNA test results.[9]

---

[7] Meinhard suggests that the district court's construction of the statute renders section 301(2)(f) redundant—that it conflates the 301(2)(f) hurdle with the ultimate determination on the merits under section 303(2)(b). But that argument misses two important procedural distinctions between these two provisions. The first goes to the operative standard of proof. The standard under the former section is a preponderance of the evidence; *testing* is allowed if it is shown by a preponderance that DNA test results will establish the petitioner's factual innocence. The standard under the latter section is quite different. It allows *vacatur of the conviction* upon a showing that DNA test results show factual innocence by clear and convincing evidence. The second distinction goes to issues addressed below. At the 301(2)(f) stage we are asking only about a *potential* for DNA test results. The proceeding gets to section 303(2)(b) only if such results are in fact generated and are favorable to the petitioner.

[8] *See also* UTAH CODE § 78B-9-303(1)(a) (a petitioner who is allowed to pursue DNA testing may seek to vacate his conviction under Part 3 only if "the result of postconviction *DNA testing* is favorable" to the petitioner (emphasis added)); *id*. § 78B-9-303(1)(b) (at the hearing on whether the conviction should be vacated, the State may "attempt to demonstrate through evidence and argument that, *despite the DNA test results*, the state possesses sufficient evidence of the person's guilt so that the person is unable to demonstrate by clear and convincing evidence that the person is factually innocent" (emphasis added)).

[9] Admittedly the legislature could have spoken more clearly. If section 301(2)(f) referred to "DNA test results" instead of "new, noncumulative evidence," we could endorse the district court's construction of the statute more readily. But that is not the standard. "[T]he legislature's failure to speak more clearly tells us little or nothing about its intent in using terms that are less clear." *Irving Place Assocs. v. 628 Park Ave., LLC*, 2015 UT 91, ¶ 16, 362 P.3d 1241. And for reasons noted above we conclude that section 301(2)(f)'s reference to "new, noncumulative evidence that will establish the person's factual innocence" is a reference to the only kind of "new,

(continued . . .)

¶ 35 That said, "new, noncumulative evidence" cannot mean just the "DNA evidence" subjected to DNA testing by itself. Such evidence would be meaningless without test results. Evidence of "DNA test results," moreover, is not limited to a mere graphical or numeric representation of the DNA found on the evidence in question.[10] Logically and legally, the parties must have the opportunity to present evidence necessary to interpret or contextualize the DNA profile generated by DNA testing. A graphical or numeric DNA profile alone would be meaningless. The court would be in no position to analyze whether that profile establishes the petitioner's factual innocence without some basis for comparison to an existing DNA database or to evidence of DNA from the petitioner or from other suspects, or without some other kind of evidentiary analysis. And the statute itself appears to provide for such analysis.[11] So although we agree with the district

---

noncumulative evidence" that *can* establish factual innocence under Part 3 of the PCRA—DNA test results.

[10] In both technical and legal literature, "DNA test results" refers, at a minimum, to a comparison of the DNA profile derived from the evidence being tested to the petitioner's DNA profile. When the question presented also implicates a third-party, "DNA test results" also encompasses a comparison to the DNA profile of other suspects, or to a larger database of possible suspects. *See, e.g.,* Kathryn M. Turman, U.S. DEP'T OF JUSTICE, *Understanding DNA Evidence: A Guide for Victim Service Providers,* OFFICE OF VICTIMS FOR CRIME BULLETIN, April 2001, at 4, *available at* https://perma.cc/L5BT-UKZ2 (the actual graphical or numerical output of the testing is called a DNA profile, and a test result is the comparison of that profile to a profile created from testing a different sample of DNA); Karen Christian, *"And the DNA Shall Set You Free": Issues Surrounding Postconviction DNA Evidence and the Pursuit of Innocence*, 62 OHIO ST. L.J. 1195, 1222 n.118 (2001) ("The results of a DNA test may be negative, meaning the crime scene DNA and the suspect's DNA do not match . . . ."); *see also generally* U.S. DEP'T OF JUSTICE, NATIONAL INSTITUTE OF JUSTICE, *Postconviction DNA Testing: Recommendations for Handling Requests*, Sept. 1999, *available at* https://perma.cc/MAP4-YN4Z.

[11] *See, e.g.,* UTAH CODE § 78B-9-302(1) (providing that a petitioner seeking DNA testing consents to "provide samples of body fluids for use in the DNA testing," suggesting that DNA test analysis under the statute will at least involve comparison of the petitioner's DNA with the DNA taken from the evidence).

court that the "new, noncumulative evidence" referred to in section 301(2)(f) is focused on DNA test results, and not on any other evidence that such results might indirectly lead to, we emphasize that the statute does not close the door on introduction of evidence necessary to interpret and contextualize the significance of those test results in a section 303 hearing to vacate the conviction.

¶ 36 That seems apparent in the terms of section 303(1)(b) of the statute, which sets the parameters of the hearing on factual innocence in a proceeding under Part 3, and section 303(2)(b), which sets the standard for proving factual innocence. Section 303(1)(b) provides that the State may "attempt to demonstrate through evidence and argument that, despite the DNA test results, the state possesses sufficient evidence of the person's guilt so that the person is unable to demonstrate by clear and convincing evidence that the person is factually innocent." UTAH CODE § 78B-9-303(1)(b). And section 303(2)(b), as noted above, provides for vacatur of the conviction only if the court "determines that the DNA test result demonstrates by clear and convincing evidence that the person is factually innocent." *Id*. § 78B-9-303(2)(b). The court cannot meaningfully determine whether the DNA test results prove factual innocence without considering evidence necessary to interpret and contextualize the DNA profile that is generated by DNA testing. Thus, evidence comparing the DNA profile to an existing database or to DNA profiles of other suspects may be considered by the court in assessing factual innocence under Part 3.

¶ 37 But that does not mean that any and all speculative evidence is fair game on the threshold question presented under section 301(2)(f). There is a difference between evidence necessary to interpret and contextualize a DNA test result and evidence that such a result might indirectly produce. The mere possibility of a confession from another suspect, for example, or of a new lead as to a new witness or the possibility of new physical evidence, would not come into play under the statute. Part 3 of the PCRA deals with establishing factual innocence by the presentation of DNA test results. And, like the district court, we do not read section 301(2)(f) to open the door to the consideration of any and all evidence that might indirectly be produced by such test results.[12]

---

[12] In so concluding, we do not foreclose the propriety of such evidence altogether. Our analysis here concerns only Part 3 of the PCRA, which deals with proof of factual innocence through DNA

(continued . . .)

¶ 38 Meinhard counters that the reading we adopt will create a catch-22 for petitioners seeking postconviction relief under Part 4 of the PCRA. He points to Utah Code section 78B-9-402(2)(a)(i), which prescribes standards for a petitioner to bring forth any "credible," "newly discovered material evidence" that "establishes that the petitioner is factually innocent." "If some or all of the evidence alleged to be exonerating is biological evidence subject to DNA testing," the provision allows the petitioner to seek DNA testing pursuant to Section 78B-9-301. *Id.* § 78B-9-402(6).

¶ 39 Meinhard claims that our reading either makes Part 4 redundant in light of Part 3, or makes it impossible for a petitioner to get DNA testing when he is directed to seek it under subsection 402(6). If the DNA test results alone are sufficient to establish the petitioner's factual innocence, Meinhard notes that there is no need for a petitioner to bring forth additional non-DNA evidence, as contemplated under Part 4. And if DNA test results are insufficient on their own to establish innocence, but may do so when combined with other newly discovered evidence, Meinhard says that the petitioner will never get DNA testing under Part 3 if DNA test results must alone establish innocence to trigger the right to testing in the first place.

¶ 40 This would all be troubling if it were correct. But we reject the premises of Meinhard's argument. Instead we accept the State's "final puzzle piece" view of the interaction between Parts 3 and 4: A petitioner who files a factual innocence petition under Part 4 may subsequently seek DNA testing, when needed, under Part 3. Thus, the requested DNA test results may be the missing piece in the innocence puzzle theorized by the petitioner, and can be said to have the potential to establish the petitioner's innocence *after* taking into account the other newly discovered evidence from the Part 4 petition. We reject Meinhard's argument on that basis. We read Parts 3 and 4 of the statute as parts of a harmonious whole. *See Strohm v. ClearOne Commc'ns, Inc.*, 2013 UT 21, ¶ 21, 308 P.3d 424 ("We interpret individual sections of the code 'in harmony with other

---

testing. And the PCRA also encompasses Part 4, which provides mechanisms for proof of factual innocence more generally. *See* UTAH CODE § 78B-9-401 to -405. Thus, a petitioner who discovers a new witness or new physical evidence, or secures a new confession, could advance such evidence in a proceeding under Part 4. *See id.* § 78b-9-402(2)(a)(i) (enabling a petitioner to introduce "newly discovered material evidence" in seeking to be declared "factually innocent").

provisions in the same statute and with other statutes under the same and related chapters.'" (citation omitted)).[13]

B

¶ 41 The district court's second legal conclusion was more implicit. In assessing the viability of Meinhard's request for DNA testing, the district court gave an implicit construction of the "potential" for a piece of evidence to "produce new, noncumulative evidence" establishing factual innocence. It did so in a series of conclusions addressed to the likelihood that the murderer may have left DNA under Peterson's fingernails or in a fingerprint on the car door handle. The court's conclusions on this score were threefold: (a) its determination, in two different portions of its opinion, that "the circumstances of the murder do not logically *require* the killer's DNA to be found under Peterson's fingernails or on the door handle," Memorandum Decision and Order at 35, 38; (b) a series of grounds for the court's determination that the killer likely did not, or would not have, left DNA; and (c) in support of the foregoing, the conclusions that the record did not show "offensive wounds" by Peterson, and that fibers found on Peterson's hands were not human hairs.

¶ 42 The district court's opinion never rendered an express construction of the statutory term "potential." But its analysis was premised on an implicit view of this term.[14] And our review must begin with our understanding of this provision.

---

[13] *See also* THOMAS M. COOLEY, A TREATISE ON THE CONSTITUTIONAL LIMITATIONS WHICH REST UPON THE LEGISLATIVE POWER OF THE STATES OF THE AMERICAN UNION 58 (1868) ("[O]ne part is not to be allowed to defeat another, if by any reasonable construction the two can be made to stand together.").

[14] In quoting and interpreting section 301(2)(f), the district court concluded that "the statute is specific in its requirement that it is the DNA evidence . . . that must *prove* the Petitioner's factual innocence." Memorandum Decision and Order at 18 (emphasis added). At the petition stage, however, there is no requirement that the DNA test results conclusively prove factual innocence; instead the question is only whether there is a "potential" of such evidence, and whether any such evidence "will" establish factual innocence. UTAH CODE § 78B-9-301(2)(f). We analyze that language below.

¶ 43 Evidence has the *potential* to produce DNA test results if it has a *possibility* of doing so. *See* WEBSTER'S NEW INT. 1932 (2d ed. 1937) (defining *potential* as "[t]hat which is possible"); AMERICAN HERITAGE 1379 (5th ed. 2011) ("The possibility that something might happen or result from given conditions . . . .").[15] A "potential," then, is something less than a likelihood—and well short of a certainty. The context of the statute confirms that principle. It does so by using two different terms on the spectrum of likelihood—"potential" and "will." Evidence must have the "potential to produce" new DNA test results, and it must be shown that such test results "will establish . . . factual innocence." UTAH CODE § 78B-9-301(2)(f). Thus, in context "potential" is something different from an assessment of what likely "will" come to pass. It is a possibility.[16]

¶ 44 The district court's implicit construction of section 301(2)(f) is incompatible with this standard. That is most apparent in the court's determination that the circumstances of Peterson's murder "do not logically require" the killer's DNA to be found. That is the language of certainty, and a potential is much less than that. But other elements of the court's analysis also seem inconsistent with the applicable sense of "potential" set forth above. To the extent the court was assessing whether it was more likely than not that the killer's DNA would be found, it was also asking the wrong question.

¶ 45 Finally, the court's analysis of the absence of evidence of "offensive wounds" by Peterson, and of the notion that fibers found in Peterson's hands were not human hairs, is also problematic. Certainly it's true that offensive wounds would be *more likely* consistent with the prediction that Peterson's fingernails could contain the DNA of his killer. But we do not think it can be said that the absence of such wounds eliminates any "potential" for such DNA. It is undisputed that Peterson had a violent struggle with his assailant. Without more, we cannot conclude from the lack of offensive wounds that there is no meaningful possibility that the

---

[15] The other senses of the noun *potential* attested in the dictionary are either technical or irrelevant here. *See Gordon v. State*, 2016 UT 11, ¶ 29 n.9, __ P.3d __ ("Dictionaries . . . reveal that words have a 'limited range of meaning' and help exclude an 'interpretation that goes beyond that range.'" (citation omitted)).

[16] That is not to say that any speculative possibility would count as a "potential." When we speak of a *potential* we don't mean certainty or even likelihood; but we also don't mean rank, wild speculation. The possibility must be a meaningful one.

assailant's DNA ended up under Peterson's fingernails. And the fact that the fibers in Peterson's hands turned out to be vegetation rather than human hair does not mean a violent struggle (or even just physical contact) between Peterson and his killer did not occur; it just means that none of the killer's hair ended up in Peterson's grasp. The absence of evidence is not the evidence of absence, and there is enough other plausible evidence to sustain a theory that the killer's DNA *could* have ended up under Peterson's fingernails.

¶ 46 For these reasons we find error in the district court's implicit construction of the statutory reference to a "potential" for the production of new DNA test results. We must therefore proceed to the question whether such error was prejudicial. This is a close call. Despite the court's (erroneous) determinations regarding the potential of the killer's DNA being found under Peterson's fingernails or on the door handle, the court ultimately rendered a conclusion rejecting Meinhard's case *even assuming* the possibility of finding some third party's DNA. Thus, the court concluded that "[s]ignificant physical and circumstantial evidence conclusively linked the Petitioner to the murder and the destruction of evidence," and that "[e]ven *setting aside* the significant eye-witness testimony of [Meinhard's wife], Taylor, and others to whom the Petitioner confessed[,] . . . evidence independently tied Petitioner to the murder and the crime scene." Memorandum Decision and Order at 28.[18] And this led the district court to conclude that "[a]lthough arguably no one piece of circumstantial evidence proves [Meinhard] guilty in

---

[18] That evidence included a single set of large footprints at Peterson's car with the left foot demonstrating an unusual gait, consistent with Meinhard's large feet (and not Taylor's smaller size), the tread of his shoes, and the hampered walking of Meinhard after his earlier crash; toothache drops found at the scene and on Meinhard; eyewitness testimony that Meinhard was arguing with Peterson earlier in the afternoon on the day of the murder; evidence that whoever destroyed evidence at Peterson's car was tired or winded by the physical exertion, and Meinhard was known to suffer from severe asthma; a 10:00 p.m. clock-in time for work the day of the murder when Meinhard had consistently checked in at 4:15 pm; complaints of pain in Meinhard's left shoulder and biceps after the murder; and a correctional officer overhearing Meinhard inform other inmates that he was in prison for having "killed somebody" by "stab[ing] him with a knife." Memorandum Decision and Order at 29-31.

isolation, when viewed in its entirety the evidence weaves together to form a compelling, coherent and internally consistent picture of [Meinhard's] actions at both the murder and cleanup." *Id.* at 31.

¶ 47 On these grounds, the district court viewed Meinhard as "the common denominator that links each unique piece of evidence." *Id.* And the court further found that Meinhard had "not provided any theory explaining how the totality of [the] evidence is in any way consistent with the guilt of another person, or why [Meinhard] confessed to numerous people if he was not guilty." *Id.*

¶ 48 For these reasons it seems possible that the district court would have reached the same conclusions on this record even absent the threshold error in (implicitly) interpreting the statute.[19] Yet we reverse and remand to allow the court to resolve the case anew under the clarifications rendered in this opinion. We do so because the above-noted legal deficiencies seem to pervade the district court's analysis. This is not a case of an error in a minor side point of discussion in the district court opinion. The court's assessment of the potential of the killer's DNA being found runs throughout the court's analysis. Thus, although we do not foreclose the possibility that the district court may reach the same conclusion anew on remand, we deem it appropriate to allow the court to reconsider the important issues in this case in light of the clarification we offer in this opinion.

III

¶ 49 This case and its companion, *Gordon v. State*, 2016 UT 11, __ P.3d __, present this court with its first opportunity to interpret the terms of the DNA testing provisions of the PCRA. In this case we affirm the district court's construction of the statute in part and reverse in part. We agree with the court's understanding of "new, noncumulative evidence"[20] but find error in its construction of the "potential" for such evidence as that term is used in section 301(2)(f).

---

[19] *See* Memorandum Decision and Order at 33 ("No possible combination of DNA test results would prove Mr. Meinhard innocent.").

[20] During oral argument both parties discussed the possibility of a non-indigent defendant obtaining DNA testing on her own without the State paying testing expenses. Because this issue was not properly raised and briefed, we decline to reach it. We therefore neither foreclose nor endorse the possibility.

And we remand to allow the court to reevaluate its disposition of the petition for DNA testing in light of this opinion.

————————